**NO. 25-1228**

---

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Western District of
Virginia, Case No. 6:24-cv-00041-NKM-CKM

---

**LIBERTY UNIVERSITY'S RESPONSE
OPPOSING MOTION TO DISMISS APPEAL**

---

Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellant*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a) and Local Rule 26.1(a), Defendant-Appellant, Liberty University, Inc., a nonstock corporation incorporated under the laws of the Commonwealth of Virginia, hereby states that it does not issue stock and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND ...............................................................................3

I.    Plaintiff's Suit Against Liberty University........................................................3

II.   Liberty University's Defenses...........................................................................5

III.  The District Court's Denial of Liberty University's Motion to Dismiss. ..........6

ARGUMENT ....................................................................................................7

I.    Liberty University's First Amendment Defenses Fit Squarely Into The
Recognized Collateral Orders Subject To Interlocutory Appeal.......................7

II.   Liberty University's First Amendment Defenses Satisfy The *Cohen* Factors
Permitting Appeals From Collateral Orders....................................................13

    A.   Liberty University's Ministerial Exception And Ecclesiastical Abstention
Defenses Conclusively Determine A Disputed Question Of Law............13

    B.   Liberty University's First Amendment Ministerial Exception And
Ecclesiastical Abstention Defenses Are Separate From The Merits Of
Plaintiff's Claims...................................................................................16

    C.   Liberty University's First Amendment Ministerial Exception And
Ecclesiastical Abstention Defenses Are Effectively Unreviewable On
Final Judgment. .....................................................................................20

CONCLUSION ...............................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Abney v. United States*, 431 U.S. 651 (1977)...........................................................8

*Billard v. Charlotte Cnty. High Sch.*, 101 F.4th 316, 324 (4th Cir. 2004) ...........9, 13

*Bowles v. Russell*, 551 U.S. 205 (2007) ...................................................................3

*Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Rev. Comm'n*,
    742 F.3d 82 (4th Cir. 2014)...................................................................................21

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) ..............................3, 7

*Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir 2015) ....14

*Corp. for Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987) .............................................................................................9

*Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 878-79 (1994) ...........21

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ...........................................................22

*Helstiski v. Meanor*, 442 U.S. 500 (1979)................................................................8

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171
    (2012).....................................................................................................................9

*In re Ayers*, 123 U.S. 443 (1887) ...........................................................................11

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*,
344 U.S. 94 (1952)....................................................................................................11

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) ....................................22

*McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013) .........................................18

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)................................................................19

*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)...................................7, 21

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979)....................................13

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020)...11, 13

*Palmer v. Liberty Univ.*, 72 F.4th 52, 79 (4th Cir. 2023) .......................................13

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,*
    506 U.S. 139 (1993) .................................................................. 8, 9, 10, 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)....................14

*Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*,
    426 U.S. 696 (1976) .............................................................................................10

*Watson v. Jones*, 80 U.S. 679 (1871) .................................................................1, 10

*Will v. Hallock*, 546 U.S. 345 (2006) .................................................................7, 18

**Statutes**

28 U.S.C. §1292 ..................................................................................3

28 U.S.C. §1292(b) ..................................................................... 2, 3, 17

42 U.S.C. §2000e ..............................................................................2, 5

42 U.S.C. §2000e-2 ............................................................................2

## **INTRODUCTION**

Though Liberty University raised several constitutional and statutory defenses, the relevant issue in Liberty University's appeal can be reduced to a single question: does the First Amendment (and, concomitantly, Title VII's statutory exemptions grounded in the First Amendment) prohibit Article III courts from asserting jurisdiction over the religious employment decisions of a religious institution, such as Liberty University, when it terminates an individual who openly, flagrantly, and unrepentantly espouses religious beliefs and practices that are directly contrary to Liberty University's sincerely held religious beliefs, employment requirements, and Doctrinal Statement? The answer must be yes, and Liberty University's appeal accepted to prevent irreparable constitutional injury.

Plaintiff's suit and the questions it raises concerning Liberty University's interpretation and application of Scripture in its Doctrinal Statement "belongs to a class, happily rare in our courts, in which one of the parties to a controversy, essentially ecclesiastical, resorts to the tribunal of the [government] for maintenance of rights which the church has refused, or found itself unable to protect." *Watson v. Jones*, 80 U.S. 679, 713 (1871). And, "[c]onscious as we may be of the excited feeling engendered by this controversy, and of the extent to which it has agitated the intelligent and pious body of Christians in whose bosom it originated," *id.* at 714, the Court is not authorized to adjudicate the proper interpretation of Scripture

1

because "the law knows no heresy, and is committed to the support of no dogma." *Id.* at 728. Indeed, "[a]ll who unite themselves to such a [religious] body do so with an implied consent . . . to submit to it." *Id.* at 729. "[I]t would be vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.* Yet that is precisely what Plaintiff seeks in this suit.

Liberty University asserted defenses grounded in the First Amendment's ministerial exception and ecclesiastical abstention doctrines, as well as, *inter alia*, the constitutionally grounded exemptions found in Sections 702 and 703 of Title VII, 42 U.S.C. §2000e-1(a); 42 U.S.C. §2000e-2(e). The district court denied each of those defenses and declined to dismiss Plaintiff's Complaint against Liberty University. (ECF No. 59.)[1] What's the upshot of all this: Liberty University—absent immediate appeal in this Court—will be subject to probing and intrusive inquiries into its sincerely held religious convictions and its religious employment requirements by an individual who claims those religious beliefs are incorrect and who openly and admittedly violated Liberty University's Doctrinal Statement. If the First Amendment operates as a bar to suit on the basis of Liberty University's religious beliefs and employment requirements, which it does, then forcing Liberty

---

[1]     Citations to this Court's docket entries are notated as "Doc.," and citations to the district court's docket are notated as "ECF No."

University to submit to the very process of inquiry the First Amendment prohibits runs roughshod over that fundamental constitutional protection.

Because timely filing of a notice of appeal is a jurisdictional requirement, *Bowles v. Russell*, 551 U.S. 205, 214 (2007), and the district court's order satisfies the requirements of the collateral order doctrine, *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949); (Doc. 11, 1), and because of Liberty University's vital interest in protecting itself from irreparable First Amendment injury that cannot be effectively reviewed after discovery and trial, Liberty University timely noticed its appeal to this Court from the district court's denial of its motion to dismiss. (Doc. 1.) Nevertheless, out of an abundance of jurisdictional caution and because the district court's order also satisfies the requirements of 28 U.S.C. §1292(b), Liberty University contemporaneously filed a Motion to Certify Interlocutory Appeal under Section 1292(b) in the district court (ECF No. 41), which the district court granted. (ECF No. 57.) The Court is currently considering Liberty University's Section 1292(b) motion. (Fourth Circuit Case No. 25-142.)

## FACTUAL BACKGROUND

### I.     Plaintiff's Suit Against Liberty University.

On July 29, 2024, Plaintiff Zinski filed a Complaint against Defendant Liberty University alleging that Liberty University violated Title VII of the Civil Rights Act by terminating Zinski's employment. (ECF No. 1, Complaint, ¶23.) In February

2023, Jonathan Zinski was hired by Liberty University as an Information Services Apprentice at the IT Helpdesk. (Compl., ¶10.) According to Zinski's allegations, on June 25, 2023—after Zinski's initial 90-day employment period—Zinski participated in an employment review with Liberty University officials. (Compl., ¶13.) A mere ten days later, Zinski informed Liberty University that, despite applying for employment as a male—Jonathan Zinksi—he now "identified as a trans woman, had been undergoing hormone replacement therapy ("HRT")," and that Zinski intended to legally change names from Jonathan to Ellenor. (Compl., ¶14.)

Liberty University informed Zinski that Zinski was in violation of Liberty University's sincere religious convictions, Doctrinal Statement, and religiously based employment requirements, and that Zinski's employment was being terminated. (Compl., ¶18.) As was clear from Liberty University's termination letter, permitting employees of Liberty University to fundamentally ignore the biological reality of their God-given birth would violate Liberty University's sincerely held religious beliefs. (ECF No. 12-2, at 1.) Liberty University's Doctrinal Statement was provided to Zinski as part of the onboarding process, and Zinski was required to acknowledge it upon accepting employment at Liberty University. (*Id.*) Zinski did— in fact—acknowledge Liberty University's sincere religious beliefs and Doctrinal Statement upon accepting employment at Liberty University (*id.*), and acknowledged that Liberty University "employ[s] a workforce that acts in

4

accordance with [its Doctrinal Statement] in order to protect [its] religious mission."
(*Id.*) Zinski acknowledged all of this despite knowing that he was executing his plan
to deny his God-given sex in contravention to the Doctrinal Statement Zinski
acknowledged and was four months into a hormone regimen that specifically
contradicts and conflicted with an employment requirement that Zinski knew Liberty
University considered as a condition of employment. (*See id.* (quoting Liberty
University Doctrinal Statement).) Zinski ignored that employment requirement,
deceptively accepted, acknowledged, and signed a document indicating compliance
with the requirement, and flouted Liberty University's sincere religious convictions
and practices. (*Id.*) Zinski then filed suit, alleging Title VII discrimination.

## II.     Liberty University's Defenses.

Liberty University moved to dismiss Zinski's claims on the basis that Sections
702 and 703 of Title VII, 42 U.S.C. §§2000e-1(a), 2000e-2(e), exempt Liberty
University, as a religious institution, in general, and a religious educational
institution, in particular, from Zinski's claims because it terminated Zinski on the
basis of its sincere religious convictions and religious employment requirements.
(ECF No. 12, 7-14.) Liberty University also moved to dismiss Zinski's claims on the
basis that Zinski's claims were barred by the First Amendment ecclesiastical
abstention doctrine (ECF No. 12, 14-17), ministerial exception (ECF No. 12, 24-37),
and freedom of association (ECF No. 12, 37-49). Liberty University also moved to

dismiss on the grounds that the Religious Freedom Restoration Act prohibited application of Title VII to Liberty University. (EF No. 12, 18-24.)

## III.    The District Court's Denial of Liberty University's Motion to Dismiss.

The district court denied Liberty University's motion to dismiss. (ECF No. 59.) In its discussion of the issues surrounding Liberty University's Motion to Dismiss, the district court recognized that "few facts" were necessary for the adjudication of Liberty University's defenses. (ECF No. 59, 3.) In other words, the questions surrounding Liberty University's Motion to Dismiss were pure legal questions surrounding a matter that has not yet been conclusively determined by this Court or Supreme Court. (*See id.* at 6 ("Several of [Liberty University's] defenses present questions of first impression in the Fourth Circuit."); *id.* at 8 ("Liberty's arguments present a novel question of law in the Fourth Circuit: whether Sections 702 and 703 entitled a religious employer to discriminate on the basis of transgender status when such discrimination accords with the employer's religious beliefs and could plausibly constitute religious discrimination.").)

The district court further concluded that many of the arguments raised by Liberty University in its Motion to Dismiss "carry substantial weight" and that there are federal judges who have adopted the approach taken by Liberty University. (ECF No. 59, 30.) When discussing the various interpretations of Title VII's exemptions, one held by Liberty University and one held by Plaintiff, it noted "both [are]

reasonable" and that "neither interpretation persuades us to the exclusion of the other." (*Id.* at 31.) Though *Bostock v. Clayton County*, 590 U.S. 644 (2020), purported to address *some* of the issues raised by Plaintiff's Complaint here, the district court noted that even "*Bostock* does not address the issue before us" because "*Bostock* does not address the applicability of Sections 702 and 703." (ECF No. 59, 35-36.) As to Liberty University's constitutional defenses, the district court likewise noted that some constitutional defenses present unique questions of first impression in this Circuit. (ECF No. 59, 54 ("Noting that the Fourth Circuit has not issued further guidance on the collision of Title VII and expressive association, we find that this question presents a question of first impression for this Court and the Fourth Circuit."). The Court denied each of Liberty University's defenses.

## ARGUMENT

### I. Liberty University's First Amendment Defenses Fit Squarely Into The Recognized Collateral Orders Subject To Interlocutory Appeal.

Zinski contends that Liberty University's First Amendment defenses do not fall into the recognized category of appeals to which the collateral order doctrine applies. (Doc. 17, 7-8.) Zinski's own analysis belies that conclusion because Liberty University's First Amendment defenses should be subject to such collateral appeals under *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949); *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); and *Will v. Hallock*, 546 U.S. 345 (2006). The denial of a number of constitutionally grounded defenses has been found to

warrant a collateral order appeal because of the constitutional significance of the defense and the evaporation of its protection once a suit progresses past the point of dismissal. *E.g.*, *Helstiski v. Meanor*, 442 U.S. 500, 507-08 (1979) (holding that the denial of a motion to dismiss brought under Speech and Debate Clause of Article I, Section 6 of the United States Constitution is a collateral order subject to immediate appeal); *Abney v. United States*, 431 U.S. 651, 659 (1977) (holding that the denial of a motion to dismiss brought under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution is a collateral order subject to immediate appeal); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (holding that denial of a motion to dismiss brought under the text of the Eleventh Amendment to the United States Constitution is a collateral order subject to immediate appeal).

The First Amendment's ministerial exception and ecclesiastical abstention defenses mirror these categories of collateral orders and should be no exception.

*First*, *Abney*, *Helstiski*, and *Metcalf*, each of which satisfied *Cohen*'s collateral order test, involved defenses claimed to arise from the text of the United States Constitution. In *Abney*, the Court found that the defense "was barred by the Fifth Amendment's guarantee" that a person not be subject to a second criminal trial. 431 U.S. at 659. In *Helstiski*, the Court found that the defense was grounded in the "fundamental guarantees of the Speech or Debate Clause." 442 U.S. at 507. In

*Metcalf*, the Court held that the relevant defense was grounded explicitly in the plain text of the Eleventh Amendment. 506 U.S. at 144. The same is true of the ministerial exception and ecclesiastical abstention doctrines, which are grounded in the text of the First Amendment. *Billiard v. Charlotte Cnty. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024) (noting the "First Amendment's command to avoid intrusive inquiry into religious belief" (quoting *Corp. for Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987)); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, (2012) ("Both Religious Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers."); *id.* at 188 (holding that intruding into a religious institution's employment decisions violates the text of the First Amendment).

**Second**, the denial of a motion to dismiss on the textually grounded defense precluded the defendant from avoiding a trial the Constitution's text prohibited. *Abney*, 431 U.S. at 659 ("There are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by Fifth Amendment's guarantee"); *Helstiski*, 442 U.S. at 507 ("This is equally true for a claim that an indictment violates the fundamental guarantees of the Speech or Debate Clause. Once a motion to dismiss is denied, there is nothing the Member can do under that Clause in the trial court to prevent the trial"); *Metcalf*, 506 U.S. at 145 ("Denials of States' and state entities' claims to Eleventh Amendment immunity

9

purport to be conclusive determinations that they have no right not to be sued in federal court").

Again, the same is true of the ministerial exception and ecclesiastical abstention defenses. Once a district court denies a motion to dismiss on ecclesiastical abstention or ministerial exception defenses, there is nothing left the Church or religious institution can do to avoid the trial that the text of the Constitution prohibits. *E.g.*, *Watson v. Jones*, 80 U.S. 679 (1871) ("*civil courts exercise no jurisdiction* [over] a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standards of morals required of them." (emphasis added)); *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976) (same). If the district court exercises that jurisdiction over matters pertaining to religious decisions of a religious institution, then the right will have been lost, and the immunity from litigation that the text of the constitutional clause was intended to provide is eviscerated. There is no reason to treat the First Amendment differently.

***Third***, the denial of a motion to dismiss on such constitutionally grounded defenses "involves a claim to a fundamental constitutional protection . . . whose resolution generally will have no bearing on the merits of the underlying action." *Metcalf*, 506 U.S. at 145. The reason for this was simple: "The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State

to the coercive process of judicial tribunals at the instance of private parties." *Id.* at 146 (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). The comparison to the First Amendment's ministerial exception and ecclesiastical abstention defenses is undeniable: "Judicial review of the way in which religious schools discharge [religious] responsibilities would undermine the independence of religious institutions in a way the First Amendment does not tolerate." *Our Lady of Guadalupe Sch. v. Morrissey-Beru*, 591 U.S. 732, 736 (2020); *id.* ("The First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94 (1952)). The purpose behind all such textual defenses was to recognize federal courts are bound to stay out of certain disputes. *Compare Metcalf*, 506 U.S. at 147 n.5 ("The Eleventh Amendment is concerned not only with the States' ability to withstand suit, but with their privilege not to be sued."), *with Our Lady of Guadalupe*, 592 U.S. at 746 ("courts are *bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions.*" (emphasis added)).

The parallels between the Eleventh Amendment immunity for States and the First Amendment's immunity for religious institutions is instructive for why denials of motions to dismiss on those grounds are collateral. Both the Eleventh

Amendment's protection for States and the First Amendment's protection for the Church are grounded in principles of separate sovereigns and independent jurisdiction. *Metcalf*, 506 U.S. at 146 ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity. . . . It thus accords the States the respect owed them as members of the federation. While application of the collateral order doctrine in this type of case is justified in part by a concern that States not be unduly burdened by litigation, its ultimate justification is the importance of ensuring that the States' dignitary interests can be fully vindicated."). The First Amendment's protection for religious institutions likewise recognizes that the Church has its own realm of sovereignty over religious matters that cannot be trampled by the Government. *See Hosanna-Tabor*, 565 U.S. at 194-95 ("The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—*is the church's alone*." (quoting *Kedroff* 344 U.S. at 119 (emphasis added)).

The orders that have been found collateral by this Court and the Supreme Court recognize that there is an importance to defenses rooted in the Constitution's text. In each such instance, the Court has permitted an appeal from collateral orders to proceed. Additionally, in each sphere where the constitutional defense was grounded in jurisdictional limitations of the respective entities, the Court has held that denials of such defenses are collateral orders subject to immediate appeal. There

is no constitutionally sound reason to orphan the First Amendment's ministerial exception and ecclesiastical abstention defenses from that group of orders.

## II. Liberty University's First Amendment Defenses Satisfy The *Cohen* Factors Permitting Appeals From Collateral Orders.

### A. Liberty University's Ministerial Exception And Ecclesiastical Abstention Defenses Conclusively Determine A Disputed Question Of Law.

Zinski contends that the district court's denial of Liberty University's motion to dismiss is not collateral because it can revisit the issues raised later. (Doc. 17, 14.) This is incorrect and ignores the reason for the First Amendment in the first place.

In the "16th-century[,] British statutes had given the Crown the power to fill high 'religious offices' and to control the exercise of religion in other ways," so America's "founding generation sought to prevent a repetition of these practices in our country." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Relying on the Republic's history, the Supreme Court has sought to "steer clear of" judicial inquiry into church employment decisions. *Palmer v. Liberty Univ.*, 72 F.4th 52, 79 (4th Cir. 2023) (Richardson, J., concurring) (quoting *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979)). This Court has even deemed the ministerial exception, "a non-waivable 'structural limitation imposed on the government by the religion clauses.'" *Billard v. Charlotte Cnty. High Sch.*, 101 F.4th 316, 324 (4th Cir. 2004) (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir 2015)) (cleaned up). Courts approach church autonomy with

great reverence and for good reason: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).

Zinski overlooks this core principle and neglects the Nation's history in stating that the ministerial exception cannot "conclusively determine the issues at stake in the order," (Doc. 17, 21), and that "nothing precludes Liberty from raising its affirmative defenses again at a later stage of the litigation." (Doc. 17, 18.) This is incorrect. Courts are jurisdictionally barred from intervening in disputes involving religious employment, *Our Lady of Guadalupe*, 592 U.S. at 746 ("courts are *bound to stay out of employment disputes* involving those holding certain important positions with churches and other religious institutions"), thus denial of a motion to dismiss on ministerial exception grounds conclusively determines (in the negative) Liberty University's immunity from unconstitutional judicial inquiries.

Judge Richardson's concurring opinion in *Palmer* is instructive. There, Judge Richardson noted that the ministerial exception unequivocally "*bars employment claims* made by ministers against religious institutions." 72 F.4th at 76 (Richardson, J., concurring) (emphasis added). Relying on the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979), Judge Richardson demonstrated that the First Amendment prohibits "*the very process of inquiry*" into Liberty University's employment decisions, *id.* (emphasis added), because

"adjudicating the merits of [plaintiff's] claim would force us to make that inquiry" into a religious institution's decisions about employment. *Id.* "***Before*** biting into that apple, we should determine whether the First Amendment protects Liberty" from that very inquiry. *Id.* (emphasis added). Judge Richarson's answer: "It plainly does. The First Amendment's ministerial exception bars [plaintiff's] suit." *Id.*

Zinski repeatedly cites to Liberty University's ability to avail itself of this "defense" at a later stage of litigation, to leave room for necessary discovery, but fails to state a single fact Zinski must uncover that would impact this Court's assessment of its jurisdiction over this matter. (Doc. 17, 19.) As Judge Richardson pointed out, the ministerial exception "entitles Liberty to *absolute immunity* over its decisions to fire" its employees. 72 F.4th at 76 (emphasis added). The reason is simple: "[s]werving around that issue" in the beginning of litigation "veers [the court] too close to the very interests that the First Amendment protects, and risks entangling us in inherently religious questions." *Id.* at 76. It is critical that this Court stay far clear of the inquiry contemplated by Zinski's Complaint because the ministerial exception is but one "specific facet of the church-autonomy doctrine that guards a religious institution's authority to select certain personnel." *Id.* And the church-autonomy doctrine "protects religious institutions' power to decide for themselves, free from state interference, matters of church government, *as well as*

*those of faith and doctrine.*" *Id.* (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)) (emphasis added).

The district court's decision to the contrary conclusively determined that Liberty University was not entitled to that defense and that—even if it was—it does not protect Liberty University from probing and intrusive inquiries in discovery and trial. Liberty University "is contesting the very authority of the Government to hale [it] to court to face trial" for its religious beliefs and employment decisions. *Abney*, 431 U.S. at 659. Raising that issue after trial is too little, too late. The district court conclusively determined the question before this Court.

## B. Liberty University's First Amendment Ministerial Exception And Ecclesiastical Abstention Defenses Are Separate From The Merits Of Plaintiff's Claims.

Zinski contends that Liberty University's First Amendment defenses are not separate from the merits because they are inextricably bound up in Zinski's own allegations. (Doc. 17, 17.) This is incorrect. As discussed *supra*, the Supreme Court has held that the limited number of defenses that are constitutionally grounded and immunize a defendant from suit altogether—rather than merely excuse from liability—is a question entirely separate from the merits. Liberty University's First Amendment defenses "involve[] a claim to a fundamental constitutional protection . . . whose resolution generally will have no bearing on the merits of the underlying action." *Metcalf*, 506 U.S. at 145.

Even the district court's order granting certification of an interlocutory appeal under 28 U.S.C. §1292(b) demonstrates why the First Amendment claims are collateral orders separate from the merits of Plaintiff's claims. The issue surrounding Liberty University's claim to immunity from Plaintiff's claims on the basis of constitutional and statutory protections involves no resolution of the facts. The district court found that its decision involved a "**pure question of law**" and that it was controlling. (ECF No. 57, 7-8 (emphasis original).) "As to the first requirement of Section 1292(b), *we are easily persuaded that this question is a controlling question of law*." (ECF No. 57, 7 (emphasis added).) Indeed, "[f]irst, it is **controlling** because (i) the Court actually decided the issue and (ii) *had the Court reached the opposite result—i.e., by deciding that Sections 702 and 703 do exempt religious institutions from sex discrimination provisions of Title VII—Liberty would be wholly immune from liability*." (ECF No. 57, 7-8 (bold emphasis original; italic emphasis added)) (cleaned up).)

Moreover, the district court noted that there were no facts necessary for the adjudication of Liberty University's defenses. As the district court noted, "the relevant facts from Plaintiff's Complaint and from Liberty University's statutory and constitutional defenses "were not even in dispute." (ECF No. 57, 8 (emphasis original).) In the district court's order that was certified for interlocutory appeal under Section 1292(b), the district court further noted that "[t]he parties do not

dispute the central premise that Liberty fired Zinski because of [Zinski's] transgender status; they solely dispute whether Title VII proscribes such action, and/or whether Liberty may claim any statutory or constitutional defenses to Title VII liability." (ECF No. 59, 1.) Thus, these questions—namely, whether certain defenses apply to bar Plaintiff's claims altogether and immunize Liberty University from suit, discovery, and trial—are wholly separate from the merits of whether Plaintiff's alleged sex discrimination claims can be proved on the merits.

If the district court's own discussion of its order was not sufficient to demonstrate that Liberty University's asserted statutory and constitutional defenses were separate from the merits, Justice Thomas's concurrence in *Our Lady of Guadalupe* puts that notion to rest.

> The Court's decision today is a step in the right direction. The Court properly declines to consider whether an employee shares the religious organization's beliefs when determining whether that employee's position falls within the 'ministerial exception,' explaining that to determine whether a person is a co-religionist … would *risk judicial entanglement in religious issues*.

*Id.* at 764 (Thomas, J., concurring) (internal citations omitted) (emphasis added).

"Conventional formulations of the [collateral order] doctrine typically add another requirement: that the ruling sought to be appealed have 'resolve[d] have resolved an important issue completely separate from the merits of the action.'" *McCarthy v. Fuller*, 714 F.3d 971, 975 (7th Cir. 2013) (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). The word 'completely' is "an overstatement[.]" *Id.* "[O]ften

the question of immunity concerns the same conduct of the defendant that the suit challenges as unlawful," which "may be why the issue of immunity is required only to be 'conceptually distinct' from the merits . . . rather than literally 'completely separate' from them." *Id*. Indeed, in *Mitchell v. Forsyth*, 472 U.S. 511 (1985), the Supreme Court recognized that a defense that "is in part an entitlement not to be forced to litigate the consequences of official conduct that a claim of immunity is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Id.* at 528. The same is true of the First Amendment defenses raised by Liberty University. If, as *Our Lady of Guadalupe* held, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions," 592 U.S. at 746, then that defense is, as in *Mitchell*, at least "in part an entitlement not to litigate the consequences" of Liberty University's religious employment decisions. 472 U.S. at 528.

In *Fuller*, the district court "ruled that a federal jury shall decide whether Patricia Fuller is a member of a Roman Catholic religious order, though if the jury decides that she is it will be rejecting the contrary ruling of the religious body (the Holy See) authorized by the Church to decide such matters." *Id.* at 976. "Once the court has satisfied itself that the authorized religious body has resolved the religious issue, the court may not question the resolution." *Id.*

Here, Liberty University has decided the central issue of this litigation, and there is no factual dispute about that determination. (ECF No. 59, 1.) Zinski's contention that an individual can "transition" to living consistent with and identifying as a gender different than that person's biological and chromosomal reality is not consistent with Liberty University's values and directly conflicts with Liberty University's religious mission and religious employment requirements. (*See* ECF No. 59, 5.) Liberty University's decision is wholly protected religious doctrine and is beyond the ken of Article III courts. As this Court held in *Billard*, "[t]he ministerial exception plays an important role in limiting courts to their proper sphere. Given a choice between enforcing a waiver and thus exceeding our authority, on the one hand, and forgiving a waiver and staying in our proper lane, on the other, we choose the latter." 101 F.4th at 326. The same should hold true here.

### C. Liberty University's First Amendment Ministerial Exception And Ecclesiastical Abstention Defenses Are Effectively Unreviewable On Final Judgment.

Zinski contends that Liberty University's constitutionally grounded defenses are not effectively unreviewable after final judgment. (Doc. 17, 19.) This, too, is incorrect. An order is effectively unreviewable after final judgment "only when 'a sufficiently important interest would be imperiled by our refusal to provide an immediate appellate review.'" *United States v. Under Seal*, 853 F.3d 706, 718 (4th Cir. 2017) (quoting *Cobra Nat. Res., LLC v. Fed. Mine Safety & Health Rev.*

*Comm'n*, 742 F.3d 82, 86 (4th Cir. 2014)). "The third *Cohen* question, whether a right is 'adequately vindicable' or 'effectively reviewable,' simply cannot be answered without a judgement about the value of the interests that would be lost through rigorous application of a final judgement requirement." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 878-79 (1994). Indeed, an order is effectively unreviewable when "delaying review until the entry of final judgment would imperil substantial public interest or some particular value of high order." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009).

Here, the Constitution has made this choice for us. It is beyond peradventure that the First Amendment is of "transcendent value to all of society," *Bigelow v. Virginia*, 421 U.S. 809, 816 (1975), and that "imperative is the need to preserve inviolate the constitutional rights [enshrined in the First Amendment]." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). As the Supreme Court has held, in the First Amendment "lies the security of the Republic, the very foundation of constitutional government." *Id.* Moreover, as this Court noted in *Billard*, "[t]he ministerial exception is a constitutional defense," and warrants "exceptions" to ordinary prudential considerations that underlie the finality rule on appeals. 101 F.4th at 327. This is even more important given the significant implications for fundamental rights, "structural concerns regarding separation of powers," *id.* at 325, the categorical prohibition on Article III courts from involving themselves in religious

disputes, *id.*, and the imperative need to avoid unconstitutional inquiry into religious beliefs. *Id.* at 329. Simply put, there is no "particular value of a high[er] order," *Mohawk*, 558 U.S. at 107, than the First Amendment.

Additionally, "it is always in the public interest to protect First Amendment liberties [and] upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) (cleaned up). Thus, delaying review of substantial First Amendment liberties that are imperiled by probing and intrusive inquiries of discovery and trial imperils the substantial public interest in upholding the First Amendment rights of religious organizations. Indeed, a finding that Liberty University's First Amendment defenses are effectively reviewable after final judgment risks that the First Amendment, "of transcendent value to all society, and not merely to those exercising their rights, might be the loser." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). This Court should accept the appeal and deny Zinski's Motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion.

/s/ Daniel J. Schmid
Mathew D. Staver, *Counsel of Record*
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellant*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the type-volume limitation of Fed. R. App. P.

27(d)(2)(A). Not counting the items excluded from the length by Fed. R. App. P.

32(f), this document contains 5,190 words.

2.      This document complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document

has been prepared using Microsoft Word in 14-point Times New Roman font.


/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2025, a true and correct copy of the foregoing was filed via the Court's ECF filing system and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Defendant-Appellant*