**NO. 25-1228 (Lead)**
**NO. 25-1581 (Member)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

ELLENOR ZINSKI,
*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Western
District of Virginia, Case No. 6:24-cv-00041-NKM-CKM

---

**DEFENDANT-APPELLANT'S OPENING BRIEF**

---

Mathew D. Staver, *Counsel of Record*
Anita L. Staver
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellant*

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and Local Rule 26.1(a), Defendant-Appellant, Liberty University, Inc., a nonstock corporation incorporated under the laws of the Commonwealth of Virginia, hereby states that it does not issue stock and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................i

TABLE OF CONTENTS ........................................................ii

TABLE OF AUTHORITIES ..................................................iv

JURISDICTION ...................................................................... 1

ISSUES PRESENTED FOR REVIEW ...................................... 1

STATEMENT OF THE CASE ................................................... 3

I.   Factual background ........................................................ 3

II.  Procedural history and order on review. .......................... 7

SUMMARY OF THE ARGUMENT ......................................... 8

STANDARD OF REVIEW ....................................................... 9

ARGUMENT ............................................................................ 9

I.   Title VII's statutory exemptions prohibit Zinski's claims against Liberty. ...................................................................... 9

    A.  Section 702 of Title VII explicitly and unequivocally precludes Zinski's claims against Liberty. ............................................... 10

    B.  Section 703 of Title VII explicitly and unequivocally precludes Zinski's claims against Liberty. ............................................... 15

    C.  The allegations of Zinski's complaint and the record below demonstrate that Liberty's termination of Zinski was based on Liberty's religion. ...................................................... 16

    D.  The relevant consideration is whether Liberty's religious beliefs preclude employing an individual living openly, intentionally, and unrepentantly in defiance of its Doctrinal Statement. ....... 18

    E.  The district court's reliance on *Bostock*'s but-for causation standard ignores the plain text of Title VII and the fact that *Bostock* did nothing to alter the constitutionally required statutory exemptions in Title VII. ............................................. 23

II.  The First Amendment ecclesiastical abstention doctrine bars the Court from inquiring into Liberty's religious doctrinal positions and employment requirements. ............................................................ 32

    A.  The ecclesiastical abstention doctrine applies to Liberty's employment decisions. ............................................................. 32

    B.  Zinski's claims against Liberty require that the court impermissibly adjudicate the correctness of Liberty's interpretation of its duty under Scripture as compared to Zinski's interpretation. ............................................................. 33

III. The Religious Freedom Restoration Act bars Zinski's claims against Liberty. .................................................................................. 40

    A. RFRA applies to all branches of government, including Article III courts, so the application of federal law to its religiously based employment decisions runs afoul of RFRA. ............................... 40

    B. Requiring Liberty to employ individuals that openly, intentionally, and unrepentantly contradict its doctrinal positions and its religious employment requirements constitutes a substantial burden on Liberty's religion. ................................. 46

    C. There is no compelling interest in requiring Liberty to employ individuals who openly, intentionally, and unrepentantly contradict its doctrinal positions and religious employment requirements. ............................................................................. 49

IV. The First Amendment ministerial exception prohibits Zinski's claims against Liberty. ................................................................................. 50

    A. The ministerial exception can and should be adjudicated on the face of a plaintiff's complaint. .................................................... 50

    B. The ministerial exception, even if properly considered an affirmative defense instead of a jurisdictional bar, should be adjudicated at the motion to dismiss stage. ............................. 52

V. The First Amendment protects Liberty's right not to associate with individuals who openly, intentionally, and unrepentantly espouse religious beliefs that are directly contrary to Liberty's religious beliefs, doctrinal positions, and employment requirements. ........... 62

    A. The First Amendment right to association applies in the employment context. ............................................................... 62

    B. The district court erred in finding that it is only a minimal burden on Liberty to employ and associate with an individual openly, intentionally, and unrepentantly engaged in behavior and beliefs that fundamentally undermine Liberty's religious mission. ................................................................................. 67

CONCLUSION ........................................................................................ 67

# TABLE OF AUTHORITIES

## Cases

*Alicea-Hernandez v. Catholic Bishop of Chicago*,
 320 F.3d 698 (7th Cir. 2003) .................................................. 60

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*,
 481 U.S. 537 (1987) ............................................................... 62

*Bear Creek Bible Church v. EEOC*,
 571 F. Supp. 3d 571 (N.D. Tex. 2021) ................................... 65

*BedRoc Ltd. v. United States*, 541 U.S. 176 (2004) ................................ 13

*Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328 (4th Cir. 1997) ...... 50

*Benjamin v. Sparks*, 986 F.3d 332 (4th Cir. 2021) .................................... 9

*Billiard v. Charlotte Cnty. High Sch.*,
 101 F.4th 316 (4th Cir. 2024) ............................. 24, 53, 54, 55

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ............................... passim

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ......................... 47, 63, 64

*Burson v. Freeman*, 504 U.S. 191 (1992) ................................................. 41

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ......... 47, 48, 49

*Carrier v. Ravi Zacharias Int'l Ministries, Inc.*,
 2022 WL 1540206 (N.D. Ga. May 13, 2022) ......................... 32

*City of Boerne v. Flores*, 521 US. 507 (1997) ......................................... 41

*Corp. for Presiding Bishop of Church of Jesus Christ of Latter-day Saints
 v. Amos*, 483 U.S. 327 (1987) ........................................ 10, 24

*Demkovich v. St. Andrew the Apostle Parish, Calumet City*,
 3 F.4th 968 (7th Cir. 2021) .................................................... 60

*Edley-Worford v. Virgina Conf. of United Methodist Church*,
 430 F. Supp. 3d 132 (E.D. Va. 2019) ..................................... 32

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) ........... 23

*EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) ......... 42, 43

*EEOC v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980) ....................... 12

*EEOC v. Roman Catholic Diocese of Raleigh*,
 213 F.3d 795 (4th Cir. 2000) ................................................. 60

*Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023) ..... 12

*Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859 (N.D. Ill. 2019) ........ 33

*Gonzales v. O'Centro Espirita Beneficente Uniao do Vegetal*,
 546 U.S. 418 (2006) ............................................................... 40

*Hall v. Baptist Mem. Health Care Corp.*,
 215 F.3d 618 (6th Cir. 2000) ................................. 11, 14, 15, 20

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) ................................. 42, 43

*Harbison v. Bell*, 556 U.S. 180 (2009) ...................................................... 13

*Hernandez v. Comm'r,* 490 U.S. 680 (1989) ............................................ 48

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
   565 U.S. 171 (2012) ........................................... 49, 51, 52, 61

*Jones v. Wolf*, 443 U.S. 595 (1979) .......................................................... 34

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952) ................................................................ passim

*Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011)..19

*King's Garden, Inc. v. FCC*, 498 F.2d 51 (D.C. Cir. 1974) ..................... 14

*Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) ........................... 9, 14, 17, 20

*Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) ............................................................. 50

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) ................... 55

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   591 U.S. 732 (2020) .................................................................. passim

*Palmer v. Liberty, Inc.*, 72 F.4th 52 (4th Cir. 2023) ................... 55, 56, 57

*Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017) ....................................... 33

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ................................................ 21, 57, 58

*Ritter v. Mount St. Mary's Coll.*, 495 F. Supp. 724 (D. Md. 1980).......... 15

*Robb v. United States*, 80 F.3d 884 (4th Cir. 1996)................................... 9

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .................... 62, 63

*Rojas v. Roman Catholic Diocese of Rochester*,
   557 F. Supp. 2d 387 (W.D.N.Y. 2008) .............................................. 42

*Rymer v. Lemaster*, 2017 WL 4414163 (M.D. Tenn. Aug. 30, 2017) ...... 33

*Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094 (2022) .......... 32

*Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*,
   426 U.S. 696 (1976) ................................................................ 34, 39, 50

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*,
   363 F.3d 299 (4th Cir. 2004) .......................................................24, 60

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ................................64, 65

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   41 F.4th 931 (7th Cir. 2022)............................................................ passim

*Starkey*, 41 F.4th at 946 .......................................................................... 15

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707 (1981)......48

*Watson v. Jones*, 80 U.S. 679 (1871) ..........................................33, 34, 37

**Statutes**

28 U.S.C. §1291................................................................1

28 U.S.C. §1292..........................................................1, 7

42 U.S.C. §2000bb(b).................................................41

42 U.S.C. §2000bb-1.............................................2, 40

42 U.S.C. §2000e(j)......................................................23

42 U.S.C. §2000e-2(e).......................................1, 15, 23

42 U.S.C. §2000e-5.......................................................1

42 U.S.C. s2000e-1........................................10, 11, 19

Fed. R. Civ. P. 12..........................................................9

## JURISDICTION

Plaintiff's Complaint was brought under Title VII of the Civil Rights Act, 42 U.S.C. §2000e-5(f). The district court had jurisdiction under 28 U.S.C. §1331. The district court entered its Order on Liberty University's Motion to Dismiss on February 21, 2025. JA024. Liberty University timely noticed its appeal under 28 U.S.C. §1291 and the collateral order doctrine on March 3, 2025, JA025, and moved the district court to certify an interlocutory appeal under 28 U.S.C. §1292(b), JA027-028, which the court granted on April 4, 2025. JA042-043. On May 23, 2025, this Court granted permission to appeal and consolidated the appeals. This Court has jurisdiction under 28 U.S.C. §1292(b) and 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

(1) Whether Title VII's statutory exemptions for religious institutions, in general, 42 U.S.C. §§2000e-1(a), and religious educational institutions, in particular, 42 U.S.C. §2000e-2(e), exempt Liberty University from claims under Title VII's general prohibition of sex-based discrimination when Liberty University terminates an individual for

violating its sincerely held religious beliefs, Doctrinal Statement, and religiously based employment requirements.

(2)    Whether the First Amendment's ecclesiastical abstention doctrine exempts Liberty University from liability for Title VII claims when it terminates an employee for violating its sincere religious beliefs, Doctrinal Statement, and religiously based employment requirements, and the adjudication of a plaintiff's claims would require inquiry into Liberty University's sincere religious convictions.

(3)    Whether the Religious Freedom Restoration Act, 42 U.S.C. §2000bb-1(c), which operates "as a kind of super statute, displacing the normal operation of other federal laws," *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020), shields Liberty University from liability under Title VII when it terminates an employee for violating its sincerely held religious beliefs, Doctrinal Statement, and religiously based employment requirements.

(4)    Whether the First Amendment's ministerial exemption doctrine exempts Liberty University from liability for Title VII claims when it terminates an employee for violating its sincerely held religious

2

beliefs, Doctrinal Statement, and religiously based employment requirements.

(5)    Whether the First Amendment's freedom of association exempts Liberty University from liability for Title VII claims when it terminates an employee for violating its sincerely held religious beliefs, Doctrinal Statement, and religiously based employment requirements and who espouses an identity and beliefs directly contrary to Liberty University's core religious mission.

## STATEMENT OF THE CASE

### I.    Factual background

On July 29, 2024, Plaintiff Zinski ("Zinski") filed the Complaint against Defendant Liberty University ("Liberty") alleging that Liberty violated Title VII of the Civil Rights Act by terminating Zinski's employment. JA012. In February 2023, Jonathan Zinski was hired by Liberty as an Information Services Apprentice at the IT Helpdesk. JA010. In that role, Zinski was required to interact face-to-face with students and staff seeking technical assistance, equipment troubleshooting, and servicing technology equipment in the IT Helpdesk office, in classrooms during classes where issues arose, and at various

other visible locations across campus. JA010. The Complaint alleges that on June 25, 2023—after the initial 90-day employment period—Zinski participated in a review with Liberty officials. JA010. A mere ten days later, Zinski informed Liberty that despite applying for employment as a male—Jonathan Zinksi—he now "identified as a trans woman, had been undergoing hormone replacement therapy," and intended to legally change his name from Jonathan to Ellenor, and be known and called by that name. JA010. Zinski informed Liberty that Zinski has been undergoing hormone replacement therapy (commencing prior to his employment at Liberty, though never disclosed), and that Zinski believed his religious beliefs permitted him to continue advancing Liberty's mission despite being directly contrary to Liberty's universal employment requirements. JA016-017.[1]

On July 8, 2023, Liberty officials notified Zinski that it would respond to his statement. JA011. On August 8, Zinski contacted Liberty again to say that no response had been received. JA)11. Liberty Human Resources officials scheduled a meeting with Zinski that same day.

---

[1]    The district court considered Zinski's letter and Liberty's response because they was integral to and explicitly referenced in Zinski's Complaint. JA048.

4

JA011. In that meeting, Steve Foster, Executive Vice President for Human Resources, and John Gauger, Chief Information Officer and Executive Vice President of Analytics, informed Zinski he was in violation of Liberty's sincere religious convictions and Doctrinal Statement and that Zinski's employment was being terminated. JA011. Liberty's letter to Zinski informed Zinski that "[e]mploying a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty's values or advance its religious mission." JA018.[2] Liberty reminded Zinski that Zinski was provided a copy of the Doctrinal Statement and that Zinski acknowledged and accepted that adherence to Liberty's religious doctrine was part of its employment requirements. JA018. Liberty noted that it does "not think permitting employees to express their 'chosen' gender identity at work is appropriate or consistent with the distinctive Christian workplace that is Liberty." JA018. Liberty's Doctrinal Statement provides that "[h]uman beings were directly created . . . in the very image of God, as either biologically male or female from the womb," JA018, and "[t]he idea that man has the final say when it comes to sex or

_____

[2]    *See supra* note 1

5

gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender." JA018. It concluded that "as a religious educational institution and workplace, based upon Liberty's Doctrinal Statement and in order to fulfill its mission, Liberty does not and will not permit employees to undertake the efforts you describe to transition away from one's birth gender through hormones and a new name, with or without surgery." JA018-019.

As Liberty's letter made plain, permitting employees to fundamentally contradict the biological reality of their God-given birth would violate Liberty's sincerely held religious beliefs. JA018. Zinski acknowledged Liberty's sincere religious beliefs and its Doctrinal Statement upon accepting employment at Liberty and acknowledged that Liberty "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] in order to protect [its] religious mission." JA018. Zinski acknowledged all this despite knowing that he was executing a plan to deny his God-given sex in contravention to the very Doctrinal Statement Zinski acknowledged and was four months into a never-disclosed hormone regimen that specifically contradicts and conflicted with an

employment requirement that Zinski knew Liberty considered as a condition of employment. JA018. Zinski ignored that employment requirement, deceptively acknowledged and signed a document indicating compliance with the requirement, and then directly opposed Liberty's sincere religious convictions and practices.

## II. Procedural history and order on review.

Zinski filed the Complaint on July 29, 2024. JA008-013. Liberty moved to dismiss the Complaint based on the First Amendment, Title VII's statutory exemptions for religious organizations, and the Religious Freedom Restoration Act. JA014. The district court denied Liberty's motion to dismiss, JA024, which Liberty appealed under the collateral order doctrine. JA025. Liberty subsequently moved the district court to certify its decision for interlocutory appeal, which the district court granted. JA029. The district court issued its Amended Opinion and Order denying Liberty's motion to dismiss on April 3, 2025, JA114, and this Court granted Liberty's timely application for permission to appeal under 28 U.S.C. §1292(b).

## SUMMARY OF THE ARGUMENT

The district court's decision should be reversed because Title VII's plain text, 42 U.S.C. §2000e-1(a) and 2000e-2(e), explicitly exempts religious organizations, in general, and religious educational institutions, in particular, from employment discrimination suits based on Liberty's religious beliefs and employment requirements.

The First Amendment's ecclesiastical abstention doctrine prohibits Article III courts from adjudicating disputes arising from Liberty's sincerely held religious beliefs and from adjudicating whether Liberty's interpretation of Scripture is correct.

The Religious Freedom Restoration Act prohibits application of federal employment laws that substantially burden Liberty's religious beliefs and employment requirements.

The First Amendment ministerial exception permits Liberty to select for itself those employees who will minister to the faithful and inculcate its values to it student body.

The First Amendment freedom of association protects Liberty's right not to employ and associate with individuals who openly, admittedly,

8

intentionally, and unrepentantly espouse views directly contrary to Liberty's and undermine its religious mission.

## STANDARD OF REVIEW

The district court's decision was based on Fed. R. Civ. P. 12(b)(1) and (6). The standard of review for both is *de novo*. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021); *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996).

## ARGUMENT

### I. Title VII's statutory exemptions prohibit Zinski's claims against Liberty.

Title VII provides several exemptions from employment discrimination suits for religious employers to permit such institutions to abide by their doctrinal practices. *See Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) ("Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's religious activities."). The district court rightly held, and Zinski did not dispute, that Liberty "qualifies as the type of institution contemplated by the plain text of both Section 702 and 703." JA068. The only question at

9

issue below, and the critical point on which the district court committed reversible error, was whether Sections 702 and 703 exempted Liberty's termination of Zinski from employment discrimination claims. The district court held Liberty was not exempt under these sections. JA068. For the reasons that follow, that decision was incorrect.

### A. Section 702 of Title VII explicitly and unequivocally precludes Zinski's claims against Liberty.

The district court held that Section 702 was "ambiguous" about whether Liberty's decision to terminate Zinski on the basis of its religious beliefs exempted it from suit. JA069. This is plainly incorrect. "As a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 682 (2020) (citing 42 U.S.C. s2000e-1(a)). "Section 702 of the Civil Rights Act of 1964, 42 U.S.C. §2000e-1, exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 330 (1987) (cleaned up). The reason for this is simple: Section 702's exemption for religious organizations "avoids the kind of intrusive inquiry into religious belief" that the First Amendment prohibits. *Id.* at 339. *See also Hall v.*

10

*Baptist Mem. Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000) (noting

that constitutional basis for Title VII's exemptions).

Title VII's statutory exception is titled, "Inapplicability of subchapter

to certain aliens and employees of religious entities." 42 U.S.C. §2000e-

1(a). It states:

> This subchapter *shall not apply . . . to a religious corporation, association, educational institution,* or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

*Id.* (emphasis added). "'This subchapter' refers to Title 42, Chapter 21,

Subchapter VI, *which comprises all of Title VII.*" *Starkey v. Roman*

*Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir.

2022) (Easterbrook, J., concurring) (emphasis added). The district court

noted that Liberty's interpretation that all of Title VII drops out when it

terminates an employee for violating its religious doctrine carries

"substantial weight," and might represent the "end of the conversation."

JA073. Nevertheless, the district court concluded that the text did not

protect Liberty. JA084-085.

Where, a Title VII claimant brings claims against a religious

educational institution, like Liberty, on the basis of alleged

11

discrimination in employment directly relating to the carrying on of Liberty's mission, Title VII explicitly and unequivocally precludes Article III courts from entertaining the claim. As Judge King noted in *Billiard v. Charlotte Catholic High School*, "a straightforward reading of § 702 of Title VII bars Billard's [sex] discrimination claim." 101 F.4th 316, 335 (4th Cir. 2024). Judge Easterbrook's opinion in *Starkey* similarly recognizes this fact:

> A straightforward reading of §2000e–1(a), coupled with §2000e(j), shows that the Diocese was entitled to fire Starkey without regard to any of the substantive rules in Title VII. . . . Section 702(a) permits a religious employer to require the staff to abide by religious rules. *A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of "religion" as § 2000e(j) defines that word.*

*Starkey*, 41 F.4th at 946 (emphasis added). *See also EEOC v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (same); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534 (7th Cir. 2023) (Brennan, J., concurring) ("So when the exemption applies, all of Title VII drops out.").

Despite concluding that Liberty was not protected by Section 702, JA084-085, the district court recognized that Liberty's position "*is the most textually faithful*: none of Title VII's prohibitions ('this subchapter') apply when seeking to employ a person of a particular religion, and there

12

is no limitation on the range of that discrimination so long as it is religiously motivated." JA074 (emphasis added). That statement is *alone* should suffice to merit dismissing Zinski's claims. After all, "the Court must adopt the interpretation of a statute that is most faithful to its text." *Harbison v. Bell*, 556 U.S. 180, 199 (2009) (Thomas, J., concurring). The Court's "inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).

Here, Section 702 left no room for dispute. Congress clearly, unequivocally, and explicitly exempted Liberty—as a religious organization—from Title VII sex discrimination suits when those suits are inextricably intertwined with Liberty's religious doctrines. *See Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring) ("The decision must itself be religious, as that word is defined in Title VII. This means, for example, that sex discrimination unrelated to religious doctrine falls outside the scope of § 702(a). *But when the decision is founded on religious beliefs, then all of Title VII drops out.*" (emphasis added)). "Firing people who have same-sex partners is sex discrimination, *Bostock* holds. . . . But it is also religious discrimination," and Liberty "is carrying out its

13

theological views; that its adherence to [Christian] doctrine produces a form of sex discrimination does not make the action less religiously based." *See id.* at 947. Title VII exempts Liberty from such claims.

Section 702 explicitly exempts Liberty from the requirement to employ individuals who blatantly, openly, and unrepentantly violate its Doctrinal Statement. "[T]he sponsors of the 1972 exemption were chiefly concerned to preserve the statutory power of sectarian schools and colleges to discriminate on religious grounds in the hiring of *all their employees*." *Little*, 929 F.2d at 950 (quoting *King's Garden, Inc. v. FCC*, 498 F.2d 51, 54 (D.C. Cir. 1974)) (emphasis added). Title VII's exemptions for religious institutions "include the decision to terminate an employee whose *conduct or religious beliefs* are inconsistent with those of its employer." *Hall*, 215 F.3d at 624 (emphasis added); *Little*, 929 F.2d at 951 ("We conclude that the permission to employ persons of a particular religion includes permission to employ *only* persons whose beliefs *and conduct* are consistent with the employer's religious precepts." (emphasis added)). Section 702 makes it abundantly clear that Liberty "does not violate Title VII's prohibition" when it discharges an employee "who has

publicly engaged in conduct regarded by the school as inconsistent with its religious principles." *Id.*

**B. Section 703 of Title VII explicitly and unequivocally precludes Zinski's claims against Liberty.**

In recognition of the influential role employees play in a scholastic environment, Congress also provided religious educational institutions with their own unique statutory exemption for the hiring and retention of only those who share their religious beliefs. Section 703 states, "it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion . . ." 42 U.S.C. §2000e-2(e). Liberty qualifies as such an institution. JA068.

Section 703 "separately provides an exemption for employment of coreligionists by schools and colleges affiliated with religious groups." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring); *Hall*, 215 F.3d at 624 (Section 703 permits a religious educational institution, such as Liberty, "to terminate an employee whose *conduct or religious beliefs* are inconsistent with those of its employer"); *Ritter v. Mount St. Mary's Coll.*, 495 F. Supp. 724, 727 (D. Md. 1980) (same). Liberty is entitled to employ only coreligionists as it defines them, and Zinski does not qualify.

15

**C. The allegations of Zinski's complaint and the record below demonstrate that Liberty's termination of Zinski was based on Liberty's religion.**

Zinski's Complaint makes plain that Zinski does not desire to act in accordance with the fundamental teachings and beliefs of Liberty, as outlined in its Doctrinal Statement. Zinski alleges that Zinski is a "transgender woman, which means that she is a woman who was assigned the sex of male at birth." JA008. Zinski alleges that so-called "gender identity" is a fundamental concept of a person's identity that can be different than the biological reality reflected in their biological chromosomes at birth. JA008-009. Zinski's allegations are an expression of Zinski's beliefs that are directly contradictory to Liberty's sincerely held religious beliefs and its employment requirements. Permitting employees of Liberty to fundamentally ignore the biological reality of their God-given birth sex would violate Liberty's sincerely held religious beliefs. JA018. More importantly, Liberty "employ[s] a workforce that acts in accordance with [its Doctrinal Statement] *in order to protect [its] religious mission*." JA018 (emphasis added). The district court recognized that Liberty's decision was based on its religious beliefs. JA044. That should have ended the inquiry. Erroneously, it did not.

16

Permitting Liberty to require its employees to live their lives in accordance with its Doctrinal Statement is critical and serves as the basis for Title VII's exemptions. *Little*, 929 F.2d at 951 ("Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices.") Zinski's conduct and manifestation of religious belief contradict the clear and unequivocal religious positions in Liberty's Doctrinal Statement that Zinski acknowledged Liberty established as employment requirements. Zinski's Complaint against Liberty should have been dismissed because Liberty is statutorily entitled to require its employees to conduct themselves in accordance with Liberty's Doctrinal Statement.

Similarly, Liberty requires that its employees ascribe to the religious beliefs of the Doctrinal Statement. Zinski made it clear that his religious beliefs do not align with Liberty's Doctrinal Statement, which Zinski explicitly rejects. JA016. Specifically, in Zinski's announcement to Liberty that Zinski was purportedly transitioning from a male to a female, Zinski stated that "self-identification as a trans woman do[es] not alter my work performance or professional conduct." JA016. Zinski's

17

opinion is irrelevant. Under Title VII's exemptions, Zinski is not entitled to announce a religious belief directly contrary to Liberty's Doctrinal Statement and demand status as a coreligionist under Title VII.

As Liberty made clear, "Employing a person who takes the measures [Zinski] describe[d] to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty's values or advance its religious mission." JA018. Liberty explicitly stated that it "does not believe such identification and flexibility is either necessary or appropriate in [Liberty's] workplace," because it transgresses Liberty's religious beliefs in "God's design for male and female," outlined in its Doctrinal Statement. JA018. The record confirms that Liberty terminated Zinski based on its religious beliefs and Zinski's conduct and religious beliefs being contrary to Liberty's. Title VII exempts that decision from suit.

### D. The relevant consideration is whether Liberty's religious beliefs preclude employing an individual living openly, intentionally, and unrepentantly in defiance of its Doctrinal Statement.

The district court erroneously stated that adjudication of Zinski's claims results in "an unwieldy exercise of *whose religion is it anyway*," JA071, and concluded it could not find that the statutory exemptions

18

protected Liberty's ability to terminate an employee who is living in open defiance of its espoused religious beliefs. JA071. The answer is neither unwieldy nor unanswered by the statute.

The answer is simple: *Liberty's religious beliefs are all that matters*.

Take the text of Section 702: "This subchapter shall not apply to a religious educational institution with respect to the employment of individuals of a particular religion to perform work connected with the carrying on *by such educational institution* of *its* activities." 42 U.S.C. §2000e-1(a) (emphasis added) (cleaned up). The entire statutory scheme is directed at "religious entities." The exemption belongs to a religious institution by saying the whole of Title VII "shall not apply" to *those entities*. *Id.* It is directed at the carrying on of *the institution's* activities. The religious beliefs of *the entity* are all that matter under the plain text.

In *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011), the religious entity informed the plaintiff that "her attire was inappropriate for a Catholic facility and that it made residents and their family members feel uncomfortable." *Id.* at 191. The employee, by contrast, claimed that "her attire was a function of *her* religious beliefs and that *she* would not change it." *Id.* (emphasis added). The religious

19

entity terminated plaintiff for her refusal to follow *its* religious employment requirements. *Id.* This Court held that Title VII exempted the entity from employment discrimination suits because the premise behind terminating the employee was her refusal to conform her religious beliefs to the employer's religious beliefs. *Id.*

In *Little*, the Third Circuit recognized that the relevant inquiry under Title VII's exemptions is the religious beliefs of the *employer*—not the employee. "Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities comprised solely of individuals faithful to *their doctrinal practices*." 929 F.3d at 951 (emphasis added). "Thus, it does not violate Title VII's prohibition on religious discrimination for a parochial school to discharge *a Catholic or a non-Catholic* teacher who has publicly engaged in conduct regarded *by the school* as inconsistent with *its religious principles*." *Id.* (emphasis added).

In *Hall*, the Sixth Circuit noted that Section 702's exemptions include "the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of *its employer*." 215 F.3d at 624 (emphasis added). When the employee challenged the termination

20

claiming that she was discriminated against because of *her religious beliefs*, the court held that federal courts are not permitted "to dictate to religious institutions how to carry out *their religious missions* or how to enforce *their religious practices*." *Id.* at 626 (emphasis added)).

In *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), this Court noted that "the language of §702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences." *Id.* at 1166. The relevant religious preferences are Liberty's—not the employee's.

Zinski attempted to convince Liberty that its religious beliefs did not compel termination of an individual who identifies with a gender different than his or her biological and chromosomal reality. Zinski stated, "I am active member of a local Christian church and strive to manifest God's love and compassion, and to bear fruit in my daily interactions." JA016. Zinski also claimed that Zinski "pray[ed] that we can turn this situation into a testament to God's grace." JA016. The inescapable import of these statements was to demonstrate Zinski's belief that one can be a practicing Christian identifying as a transgender without "reflect[ing] negatively" on Liberty. JA016. There's just one

21

problem: that is not *Liberty's* position. Liberty made clear that it "recognize[s] that some have come to faiths that are different than Liberty's," but that Liberty "will look to its Doctrinal Statement when discerning the appropriate balance on workplace inclusivity, acceptance and grace." JA018.

In other words, Liberty made clear that "faiths that are different than Liberty's," JA018, are irrelevant to its employment decisions. Liberty looks to *its* religious beliefs to determine who may carry out *its* religious mission via employment. It simply does not matter that others, including a church that Zinski purportedly attends, may have different religious beliefs concerning transgender ideology. Liberty made its religious beliefs clear to Zinski, "The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of Creation chooses gender." JA018. Title VII entitles Liberty to determine for itself what its religious beliefs are and to require its workforce to share those religious beliefs. 42 U.S.C. §2000e-2(e). That is the definition of a coreligionist. Zinski's actions and beliefs ran afoul of Liberty's clearly

22

articulated and sincerely held religious beliefs, and it was entitled under Title VII to terminate Zinski on that basis.

**E. The district court's reliance on *Bostock*'s but-for causation standard ignores the plain text of Title VII and the fact that *Bostock* did nothing to alter the constitutionally required statutory exemptions in Title VII.**

Title VII did not leave anyone guessing as to what was protected by Sections 702 or 703. Congress made clear that, for purposes of Title VII, "religion" means "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j). *See also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015). Liberty imposes its religious requirements on all employees, regardless of sex, and requires conformance with all aspects of Liberty's religious convictions, including observance, practices, conduct, and belief. JA018-019.

The district court relied heavily on *Bostock* to overlook the plain text of Title VII and ignore what the court admitted was the most textually faithful reading of Title VII's exemptions. JA074. Though much of the district court's discussion focused on the statutory language of Title VII, the exemptions upon which Liberty based its defenses and under which it is exempt from Zinski's claims are constitutionally grounded in the

23

First Amendment. In other words, it is not just the statutory text that compels dismissal of Zinski's claims, but the First Amendment. "Title VII's religious exemptions, though statutory, are also constitutionally inspired, implementing the First Amendment's command to avoid intrusive inquiry into religious belief." *Billiard v. Charlotte Cnty. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024) (quoting *Amos*, 483 U.S. at 339); *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 306 (4th Cir. 2004) (same). *Bostock* did nothing to alter Title VII's constitutionally required statutory exemptions.

Regardless of the starting point for the inquiry, *Bostock* did not override Liberty's entitlement to exemptions for its religious employment decisions. *Bostock* explicitly noted that it was addressing a singular question. 590 U.S. at 681 ("The *only question* before us is whether an employer who fires someone *simply* for being homosexual or transgender has discharged or otherwise discriminated against that individual because of such individual's sex." (emphasis added)). In other words, the Court was addressing the limited question of whether—under Title VII *generally*—an employer *with no other statutory or constitutional protections* violates Title VII by making an adverse employment decision

24

against an individual who identifies as transgender. Despite recognizing the limitations of *Bostock*, the district court nevertheless found that—because of *Bostock*—"[i]f discharge based upon transgender status is sex discrimination under Title VII generally, it follows that the same should be true for religious employers." JA080. But that only "follows" if one ignores the explicit statutory exemptions and *Bostock*'s own statements that it was *not* addressing those exemptions.

The district court saw "no reason why *Bostock*'s but-for causation standard should not carry over to Sections 702 and 703." JA078-080. "In other words, a religious motivation does not trump the bright-line rule of no but-for sex discrimination in the workplace." JA080 (emphasis original). This is incorrect. Title VII's religious exemptions are to the whole of Title VII, including sex discrimination, and the First Amendment elevates religious protection over sex discrimination.

First, the Supreme Court made clear it was not addressing the question before this Court. It noted that "*no other religious liberty claim is now before us.*" 590 U.S. at 682 (emphasis added); *id.* ("none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way."). *Liberty*

25

*does*. The Court stated that "other employers in other cases may raise free exercise arguments that merit careful consideration." *Id. Liberty does*.

The Court noted that it was "deeply concerned with preserving the promise of free exercise of religion enshrined in our Constitution," *id.* at 681, and that so, too, was Congress because "[a]s a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Id.* at 682. The Supreme Court specifically noted that Sections 702 and 703 would impact the result reached in *Bostock*. Thus, the district court's conclusion certainly does not follow from *Bostock*. The Court did not decide the issue here because "how these doctrines protecting religious liberty interact with Title VII are questions for future cases too." *Id.* The future is here.

By its own terms, *Bostock*'s precedential authority is limited to the facts before the Court in *that* case. *Bostock* did not address the exemptions available to Liberty under Sections 702 and 703 in *this* case, and it left for future cases where religious exceptions are raised as a defense to determine whether Title VII exempts such institutions from

26

claims such as Zinski's here. Liberty's decision was based on its sincere religious convictions, and it is exempt from Zinski's claims.

Second, the district court's but-for causation standard ignores the realities of Liberty's religious employment decisions. The district court held that if any religious institution "discriminates on the basis of any other protected class in a but-for fashion, a statutory violation occurs, even if the decision was religiously motivated." JA080. It concluded that sex discrimination "cannot be converted into religious discrimination by claiming a religious motivation," JA081, and "religious institutions cannot discriminate on the basis of sex, even if motivated by religion." JA082. This is incorrect.

Assume Zinski, in addition to announcing an intention to "transition" from male to female and identify as an individual different from the chromosomal and biological reality of Zinski's birth, informed Liberty that Zinski had adopted a religious belief that required Zinski to become an advocate for individuals claiming to be transgender, was starting an organization solely dedicated to the advancement of that cause, and intended to spend every hour outside of the workday promoting and advocating for the organization. Assume further that

27

Zinski stated the intention to become the face of a movement designed to change the beliefs of religious organizations, including Liberty, concerning the Biblical understanding of gender. Zinski's stated religious beliefs and Zinski's outward conduct would demonstrate that Zinski did not accept Liberty's religious beliefs, that Zinski was actively seeking to undermine and change Liberty's religious beliefs, and that Zinski's acknowledgement of Liberty's religious employment requirements at hiring was deceptive. It would demonstrate a fundamental disagreement with Liberty's Doctrinal Statement and would show that Zinski's beliefs were not those of a coreligionist. Liberty's decision to terminate Zinski's employment on that ground would be religiously grounded because Zinski would have shown non-conformance with Liberty's religious employment requirements. It was the manifestation of Zinski's stated religious beliefs *and* his announcement that Zinski was identifying as a gender different than his biological and chromosomal reality that compelled Liberty to terminate Zinski's employment. Under the district court's holding, Liberty would be powerless to terminate such an employee—even though that employee expressly stated his intention to undermine Liberty's religious mission—because his identification as a

28

transgender would be one component of that employee's termination. Such is not the law.

Consider a more direct comparison. Assume that a young female, Mary Doe, is hired at Liberty after telling them she is a Christian, agrees with all of Liberty's Doctrinal Statement, and agrees that she will be a faithful messenger of Liberty's Evangelical Christian message to its students, faculty, and staff to which she provides services. Mary signs the acknowledgment of Liberty' Doctrinal Statement and employment requirements. After receiving a 90-day review, Mary walks into the IT Helpdesk offices a few days later, dressed not in her Liberty IT outfit, but with a burka. Mary says she has become a Muslim and now disagrees with Liberty's Doctrinal Statement. Liberty terminates Mary because her new identity violates Liberty's Doctrinal Statement. Mary alleges sex discrimination because only Muslim women are required to wear a burka, so Liberty's termination of her employment necessarily includes a but-for sex component, "even if religiously motivated." JA082. Liberty's decision to terminate Mary was motivated by its religious doctrine, which precludes hiring devout Muslims on the basis of its religious beliefs, but—under the district court's holding—Liberty would be prohibited

29

from terminating Mary because its religious motivation arose from something unique to female Muslims—*i.e.*, was sex-based because only Muslim women wear burkas. This is precisely what occurred in *Kennedy*. 657 F.3d at 189. This Court nevertheless held that the religious organization was exempt from Title VII claims on that basis, despite its connection to a female-only head covering requirement.

Now, consider a slight alteration closer to present circumstances. Presume Jackson Doe followed the precise path as Mary above in terms of acknowledgement, acceptance, and hiring. On July 5, Jackson walks into Human Resources dressed not in Jackson's Liberty IT outfit, but is wearing a burka. Jackson states that he has been in the process of transitioning to identify with Islam and transitioning to identify as a female and believes the Islamic faith requires him to wear a burka, and states that he must go outside several times each day to pray towards Mecca.

Would Liberty's basis for the employee's termination be any less religious in the latter scenario than in the former? Certainly not. The fundamental problem in both scenarios is that the employee informed Liberty by word and conduct that their religious beliefs were

30

fundamentally contrary to Liberty's Doctrinal Statement, which they both acknowledged and agreed were employment requirements at Liberty. The only difference is that Jackson's transition manifested more religiously contrary words and conduct than Mary's. It mattered not what the gender of the employee was. It was the employee's outward manifestation of religious beliefs directly contrary to Liberty's that resulted in the termination.

Under the district court's decision, the stated identity of the job applicant or employee is all that matters. Such construction is evident because Zinski contends Zinski is a Christian, and transgenderism is consistent with Christendom. JA016. According to the district court, Liberty's decision cannot be based on religion whenever it involves characteristics unique to a single sex, even if those characteristics are inherent in a manifestation of religious belief. That is not the law, and to impose such a construction on Liberty's employment decisions would violate the very purpose behind the Title VII statutory exemptions. The district court's decision was in error.

## II. The First Amendment ecclesiastical abstention doctrine bars the Court from inquiring into Liberty's religious doctrinal positions and employment requirements.

### A. The ecclesiastical abstention doctrine applies to Liberty's employment decisions.

As a threshold matter, the ecclesiastical abstention doctrine applies to more than just churches, and provides identical ecclesiastical protection for religious organizations, including Liberty. *E.g.*, *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) ("The opinion radiates, however, a spirit of freedom for *religious organizations*, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." (emphasis added)); *Edley-Worford v. Virgina Conf. of United Methodist Church*, 430 F. Supp. 3d 132, 137 (E.D. Va. 2019) (noting the First Amendment's ecclesiastical abstention doctrine applies to "religious organizations"); *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1094 (2022) (Alito, J., statement) ("The First Amendment gives special solicitude to the rights of *religious organizations*" (emphasis added)); *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, 2022 WL 1540206, *5 (N.D. Ga. May 13, 2022); *id.* (citing *Puri v. Khalsa*, 844 F.3d 1152 (9th

32

Cir. 2017) (religious non-profit organization)); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859 (N.D. Ill. 2019) (religious educational institution); *Rymer v. Lemaster*, 2017 WL 4414163 (M.D. Tenn. Aug. 30, 2017) (private spiritual advisor).

**B. Zinski's claims against Liberty require that the court impermissibly adjudicate the correctness of Liberty's interpretation of its duty under Scripture as compared to Zinski's interpretation.**

The district court held that the ecclesiastical abstention doctrine was inapplicable because the case did not require the court to adjudicate whether Zinski's interpretation of Scripture is correct. JA112. The district court said it did not even need to "glance at [S]cripture, second-guess a religious tribunal, or put a civil stamp of approval on religious doctrine." JA112. This is fundamentally incorrect because this case pits Zinski's religious beliefs against Liberty's. But the only belief that matters is Liberty's and the district court must defer to it.

It has been settled for over 150 years that the First Amendment ecclesiastical abstention doctrine prohibits Article III courts from entertaining suits arising specifically from religious doctrinal positions, as such decisions are exclusively within the province of the church. *See, e.g.*, *Watson v. Jones*, 80 U.S. 679 (1871); *Serbian E. Orthodox Diocese for*

33

*U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94 (1952); *Jones v. Wolf*, 443 U.S. 595 (1979).

In essence, Zinski's Complaint and the question it raises concerning Liberty's interpretation of Scripture in the Doctrinal Statement "belongs to a class, happily rare in our courts, in which one of the parties to a controversy, essentially ecclesiastical, resorts to the tribunal of the [government] for maintenance of rights which the church has refused, or found itself unable to protect." *Watson*, 80 U.S. at 713. The Court is not authorized to adjudicate the proper interpretation of Scripture because "the law knows no heresy, and is committed to the support of no dogma." *Id.* at 728. Indeed, "[a]ll who unite themselves to such a [religious] body do so with an implied consent . . . to submit to it." *Id.* at 729. "[I]t would be vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.*

This is precisely what Zinski's Complaint requests here. Zinski acknowledged Liberty's Doctrinal Statement and knew what the employment requirements were under such doctrinal positions. JA018.

34

Yet, knowing this stark disagreement with the doctrinal positions, Zinski informed Liberty of those doctrinal disagreements, stated that Zinski's own positions were not a problem for "active member[ship] [in] a local Christian church" that holds religious positions different than Liberty, that Zinski desired for Liberty to use the revelation as "a testament to God's grace," in a manner that was unacceptable under its Doctrinal Statement, that Zinski's choices would "not reflect negatively on the University," and that Zinski's choices "do not alter [Zinski's] work performance or professional conduct." JA016. Zinski's Complaint makes clear that Zinski believes Liberty's Doctrinal Statement is incorrect because it represents "a rejection of who [Zinski] is on a fundamental, unchangeable level." JA011.

Zinski's claims necessarily inject religious doctrine into the dispute. Zinski did so by stating that Zinski's "faith has been a guiding force throughout this process," that Zinski believes "God led [Zinski] to Liberty, and that Zinski believes he can fulfill Liberty's mission of 'Training Champions for Christ.'" JA016. All of these positions steeped in religious doctrine are directly contradictory to Liberty' Doctrinal Statement and reflect a fundamental disagreement with Liberty's

35

theology. To determine whether Zinski or Liberty is correct about whether Liberty can allow Zinski to remain employed with Liberty and fulfill its unapologetically Christian mission (as Zinski claims) inescapably requires the Court to delve into religious doctrine and ignores the fundamental principle that Liberty has the "power to decide for [itself], free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 115.

Liberty's unequivocal doctrinal position is that "a denial of birth sex by self-identification with a different gender" is sin, and that "[t]he idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender." JA018. Whether Zinski believes that is correct or, whether Zinski believes Liberty is compelled to terminate Zinski is of no moment. The First Amendment forbids the very inquiry Zinski seeks, which "must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Id.* at 116.

As the Supreme Court noted in *Watson*, Liberty's officials "are the best judges of what constitutes an offence against the word of God and

36

the discipline of the church." 80 U.S. at 732. Simply put, "civil courts exercise no jurisdiction [over] a matter which concerns theological controversy, church discipline, ecclesiastical government, or *the conformity of the members of the church to the standards of morals required of them*." *Id.* at 733 (emphasis added). And "[t]his is applicable to questions of discipline, or of faith, or of ecclesiastical rule, custom, or law." *Kedroff*, 344 U.S. at 115.

The same is true of Zinski's claims here. Zinski asks this Court to determine that Zinski's interpretation of Scripture is correct, that Liberty's Doctrinal Statement is incorrect, and that Zinski's interpretation of Scripture entitles Zinski to remain an employee in good standing under the appropriate interpretation of Scripture. JA011. The interpretation of Scripture is inherent in the question Zinski poses: whether Zinski, despite being in direct conflict with Liberty's Doctrinal Statement, could have been brought by God to Liberty and can fulfill Liberty's mission despite his open rebellion to Scripture. Liberty says no—that is all that matters.

Moreover, the district court—while stating that it was not adjudicating any matters of Scripture—proceeded to do precisely that.

37

The district court said that it "is not even clear that Zinski—an employee in the IT department—maintains any 'spiritual function' within the institution such that the Court's review of Liberty's decision to fire [Zinski] would impinge upon Liberty's First Amendment interests." JA105. Whether an employee is "sufficiently religious" is a religious determination. "[J]udges have no warrant to second-guess that judgment or to impose their own credentialing requirements." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 760 (2020).

While Zinski claimed transitioning from male to female is acceptable in the Christian church he allegedly attended and without impact in the Christian workplace of Liberty, JA016, the district court stated that it was only asked to determine "whether Title VII prohibits a religious institution from firing a transgender person, not whether a religious institution, like Liberty, has properly interpreted its religious doctrine when determining that a transgender person violates religious law and must be fired." JA112. But, to answer that question, the Court is required to adjudicate whether Liberty's religious beliefs actually compelled Zinski's termination in light of the religious position held by Zinski's church, whether Zinski's new manifested identification has no impact in

38

a Christian workplace, and whether Liberty's decision to terminate Zinski because of the manifestation of a religious belief contrary to Liberty's Doctrinal Statement was a religious decision.

The district court explicitly delved into the correctness of Liberty's religious beliefs by concluding that the worst thing Liberty suffers from employing Zinski while Zinski is in open rebellion to its religious tenets is that "Liberty may be seen as a hypocrite for employing a transgender person when it opposes transgender identity." JA108. It continued: "the same could be said for Liberty's employment of any other type of person who 'sins' despite Liberty's opposition to sin in general." JA108. In other words, the district court measured the depths, weights, and correctness of Liberty's religious beliefs, explicitly opined on Liberty's treatment of sin, and employed a balancing scale to determine how much sin is acceptable to Liberty and how much it must tolerate. That is religious inquiry, plain and simple. Again, Liberty's position on that issue is all that matters.

The district court can "exercise no jurisdiction" over questions of whether Zinski conforms "to the standards of morals required" of Liberty's employees. *Milivojevich*, 426 U.S. at 714. But its measurement

of "tolerable sin" is a judgment on required morals. The First Amendment

forbids that inquiry.

## III. The Religious Freedom Restoration Act bars Zinski's claims against Liberty.

### A. RFRA applies to all branches of government, including Article III courts, so the application of federal law to its religiously based employment decisions runs afoul of RFRA.

The Religious Freedom Restoration Act ("RFRA") states,

"Government shall not substantially burden a person's exercise of

religion even if the burden results from a rule of general applicability."

42 U.S.C. §2000bb-1. The only exception to burdening religious exercise

is if the government demonstrates that its burden is both in furtherance

of a compelling government interest and is the least restrictive means of

doing so. 42 U.S.C. §2000bb-1(b). RFRA requires a focused inquiry "to the

person." *Id.*; *Gonzales v. O'Centro Espirita Beneficiente Uniao do Vegetal*,

546 U.S. 418, 430 (2006) ("RFRA requires the Government to

demonstrate that the compelling interest test is satisfied through

application of the challenged law to the person—the particular claimant

whose sincere exercise of religion is being substantially burdened.").

RFRA adopted "the most demanding test known to constitutional law,"

40

*City of Boerne v. Flores*, 521 US. 507, 534 (1997), which is rarely passed. *Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . .").

RFRA applies and may be raised by Liberty "as a claim or defense in a judicial proceeding." 42 U.S.C. §2000bb-1(c). RFRA applies against all branches of government, including burdens imposed by the judicial branch in an employment discrimination suit. 42 U.S.C. §2000bb-2(1) ("the term 'government' includes a *branch* . . . of the United States" (emphasis added)). There is little doubt that RFRA was intended to protect Liberty here because the explicit purpose of RFRA was to restore strict scrutiny as the governing standard and "to guarantee its application *in all cases* where free exercise is substantially burdened." 42 U.S.C. §2000bb(b) (emphasis added).

Indeed, RFRA "operates as a kind of super statute, displacing the normal operation of other federal laws," and "*supersede[s] Title VII's commands in appropriate cases*." *Bostock*, 590 U.S. at 682 (emphasis added). As the Second Circuit recognized, "RFRA is unusual in that it amends the entire United States Code," *Rweyemamu v. Cote*, 520 F.3d 198, 202 (2d Cir. 2008), because "[a]t bottom, the import of RFRA is that,

41

whatever other statutes may (or may not) say, 'the Federal Government may not, *as a statutory matter*, substantially burden a person's exercise of religion.'" *Id.* (quoting *Gonzales*, 546 U.S. at 424) (emphasis original). *See also Rojas v. Roman Catholic Diocese of Rochester*, 557 F. Supp. 2d 387, 396 (W.D.N.Y. 2008) ("RFRA applies to all federal law, and therefore amended federal discrimination statutes such as Title VII."). RFRA has been recognized as a defense in claims between private parties. *See, e.g.*, *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996); *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006).

In *Hankins*, a former clergy member sued his church and its bishop under the Age Discrimination in Employment Act. 441 F.3d at 99. The Second Circuit held that RFRA barred the minister's claims against the church. *Id.* at 103. Noting that "[t]here is little caselaw addressing the issue of whether RFRA applies to an action by a private party seeking relief under a federal statute against another private party who claims that the federal statute substantially burdens his or her religious exercise," it held that RFRA was "broad enough to encompass such a case." *Id.* Because RFRA "applies to all federal law, and the implementation of that law" and allows a defendant claiming that

42

application of such law constitutes a substantial burden on his religious beliefs to be a violation of RFRA "as a defense in a judicial proceeding," RFRA "*easily covers the present action.*" *Id.* (emphasis added). The Second Circuit held that RFRA was available as a defense to private actions. *Id.*

"The ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved party." *Id.* Simply put, "[a]n action brought by an agency such as the EEOC is clearly one in which the RFRA may be asserted as a defense, and no policy of either RFRA or the ADEA should tempt a court to render a different decision on the merits in a case such as the present one," involving only private parties. *Id.*

In *Catholic University*, the University was sued by both the EEOC *and* its employee, Sister Elizabeth McDonough, for sex discrimination under Title VII. 83 F.3d at 457. The D.C. Circuit held that RFRA has "in effect, incorporated a statutory compelling interest test into Title VII that Catholic University is entitled to invoke." *Id.* at 468. And, because application of even neutral employment laws can, in some instances, burden religious exercise, RFRA is available as a defense to those laws.

43

*Id.* at 470 (noting that RFRA created "a compelling interest defense for the benefit of those whose free exercise rights would be burdened by a neutral *federal* law of general application," such as Title VII).

Here, just as in *Catholic University* and *Hankins*, the EEOC could have brought claims against Liberty under Title VII, and Plaintiff filed a charge of discrimination with the EEOC for just that purpose. JA002. Later, Plaintiff requested that the EEOC dismiss its investigation and provide him with a Notice of Right to Sue. JA009; JA020. The ability of Liberty to raise defenses under the RFRA cannot vary depending on whether the EEOC or a private party brings an identical claim under an identical statute. The district court acknowledged that this dichotomy "creates an awkward result." JA086. But the result is more than just awkward, the result itself substantially burdens Liberty's rights under the statute to subject them to the whims of the plaintiff.

This is why the Supreme Court in *Bostock* noted that employers, such as Liberty, can raise RFRA in future cases in which application of Title VII would substantially burden their religious exercise. *See* 590 U.S. at 682. Requiring Liberty to continue employing a person openly, intentionally, and unrepentantly defying its sincerely held religious

44

convictions is a substantial burden the government is not permitted to impose on Liberty by virtue of Title VII. The burden comes by virtue of a federal statute (Title VII) being enforced against a religious entity (Liberty) by a branch of the federal government (the judicial branch). Treating the burden on Liberty as completely different based on whether the EEOC or a private litigant brings the complaint would make Liberty's fundamental right to religious exercise and the critical protections RFRA was intended to enshrine subject to the calculations a plaintiff who is demonstrably hostile to Liberty's religious beliefs. Such is not the law. *See Hankins*, 441 F.3d at 103.

If RFRA is limited to only when the EEOC brings a complaint against a religious defendant, no private plaintiff would ever accept the EEOC bringing such a claim. Every private plaintiff would merely request a right to sue notice to deprive the religious employer of the most potent defense available to it. RFRA cannot be construed to lead to such absurd results and thwart the very purpose of the super-statute to provide vigorous protection for religious liberty. *C.I.R. v. Brown*, 380 U.S. 563, 571 (1965) (statute cannot be construed if that construction "would lead to absurd results or would thwart the obvious purpose of the

45

statute"). More than just producing impermissible result, such a construction ignores *Bostock*'s express language. 590 U.S. at 682 (noting that petitioners had raised, but subsequently abandoned, a RFRA claim below but "other employers in other cases" could raise RFRA as a defense "that merits careful consideration").

**B.  Requiring Liberty to employ individuals that openly, intentionally, and unrepentantly contradict its doctrinal positions and its religious employment requirements constitutes a substantial burden on Liberty's religion.**

Though finding that RFRA does not apply, the district court proceeded to analyze the defense and held that it was unmerited. The district court found that "Title VII likely passes strict scrutiny." JA087. Its reason? "[E]nforcing this statute in Zinski's case merely required Liberty to maintain an employee who has not followed the university's Doctrinal Statement to the letter, *i.e.*, an employee who has sinned." JA081. Further, it held that requiring Liberty to retain Zinski as an employee "does not require Liberty to change its belief, to endorse Zinski's behavior, or to allow Zinski to spread a new message." JA081. This is patently erroneous. Again, Article III courts impose a substantial burden on religious exercise when they opine on how much sin is tolerable for a religious institution. To claim it is no burden when

46

employees of a Christian institution do not follow its religious beliefs "to the letter" is again opining on how much sacrifice of religious convictions Liberty must accept. RFRA prohibits that burden.

Zinski's mere presence as an employee of Liberty is tacit endorsement of a message antithetical to its religious mission and sends the message that Liberty endorses Zinski's sin. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) (noting that the mere "presence" of an individual with views directly contrary to the organization "force[s] the organization to send a message to . . . the world that the [organization] accepts" behavior that is directly contrary to its mission). There could be no more substantial burden than forcing Liberty to publicly advance a message directly contrary to its raison d'être.

Under RFRA, the definition of the "exercise of religion" includes "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (quoting 42 U.S.C. § 2000cc-5(7)(A)). Under RFRA, the only relevant inquiry is whether Liberty has a sincerely held religious belief that compels it to abstain from a particular action—acceptance of

47

employees that openly and intentionally violate its Doctrinal Statement and religious convictions. Liberty has shown that. JA018.

The "narrow function" of a court "'is to determine' whether the line drawn [between conduct that is and is not permitted under one's religion] reflects an honest conviction.'" 573 U.S. at 696 (emphasis added) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 716 (1981)). Liberty clearly reflected its honest convictions to Zinski. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989).

"[T]he question that RFRA presents [is] whether the [Title VII's application] imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with their religious beliefs." *Hobby Lobby*, 573 U.S. at 724. As in *Hobby Lobby*, an individual's open, intentional, and unrepentant disregard for the Bible's teachings on sex and gender, as articulated in Liberty's Doctrinal Statement, "is sufficient to make it immoral for [Liberty] to provide the [employment]." 573 U.S. at 724. Liberty's "belief implicates a difficult and important question of religion and moral philosophy." *Id.* "Arrogating the authority to provide

48

a binding national answer to this religious and philosophical question," Title VII's application in this manner would "in effect tell [Liberty] that [its] beliefs are flawed. For good reason, we have repeatedly refused to take such a step." *See id*. Requiring Liberty to violate its sincere religious convictions is a substantial burden under RFRA.

**C.** **There is no compelling interest in requiring Liberty to employ individuals who openly, intentionally, and unrepentantly contradict its doctrinal positions and religious employment requirements.**

Because mandating Zinski's continued employment imposes a substantial burden on Liberty, such imposition must be supported by a compelling government interest in enforcing Title VII against Liberty in such a manner. The Complaint does not and cannot satisfy that standard. RFRA requires application of the compelling interest test "to the person," (*i.e.*, Liberty) and "requires [the Court] to look beyond broadly formulated interests." *Hobby Lobby*, 573 U.S. at 726. As the Court noted in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), "[t]he interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 181. When it comes

49

to the interplay between those interests, RFRA and "the First Amendment [have] struck the balance for us." *Id.*

As this Court has held, "upholding constitutional rights serves the public interest" in a compelling way. *Newsom ex rel. Newsom v. Albermarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). Because there is no compelling government interest in requiring Liberty to violate its religious convictions, Zinski's attempt to enforce Title VII against Liberty in this instance violates RFRA.

## IV. The First Amendment ministerial exception prohibits Zinski's claims against Liberty.

### A. The ministerial exception can and should be adjudicated on the face of a plaintiff's complaint.

The decisions concerning religious doctrine and policy are reserved for the church, and courts have no jurisdiction to review such decisions. *See, e.g.*, *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) ("decisions of religious entities about the appointment and removal of ministers and persons in other positions of similar theological significance are beyond the ken of civil courts. Rather, such courts must defer to the religious organizations on

50

matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.").

The Supreme Court's precedents make clear that it is not within the judicial ken of Article III courts to question a religious organization's employment decisions. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 592 U.S. 732 (2020). It is now beyond cavil that both the Free Exercise and Establishment Clauses of the First Amendment prohibit intrusion into a religious organization's employment decisions. *Hosanna-Tabor*, 565 U.S. at 188.

> Indeed,

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of *those who will personify its beliefs*. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* (emphasis added).

"The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason." *Id.* at 194. "The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—*is the church's alone.*" *Id.* at 194-95 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. America*, 344 U.S. 94, 119 (1952)) (emphasis added). Because the First Amendment guarantees judicial limits on the intrusion into the employment decisions of a religious institution, *Hosanna-Tabor* held that "the ministerial exception *bars* such a suit." *Id.* at 196 (emphasis added). The reason for that is simple: "the First Amendment has struck the balance for us, and the church must be free to choose those who will guide its way." *Id.* (cleaned up).

### B. The ministerial exception, even if properly considered an affirmative defense instead of a jurisdictional bar, should be adjudicated at the motion to dismiss stage.

The High Court's subsequent foray into the ministerial exception further suggested that the ministerial exception properly operates as an immunity from suit, rather than a mere defense to liability. Under the ministerial exception, "courts are *bound to stay out of employment disputes* involving those holding certain important positions with

52

churches and other religious institutions." *Our Lady of Guadalupe Sch.*, 591 U.S. at 746 (emphasis added). *See also id.* at 747 (noting that in *Hosanna-Tabor* "we unanimously recognized that the Religion Clauses *foreclose certain employment discrimination claims* brought against religious organizations" (emphasis added)). "When a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* at 762.

As Justice Thomas opined, "[t]he First Amendment's protection of religious organizations' employment decisions is *not limited* to members of the clergy or others holding positions akin to that of a 'minister.'" *Id.* at 762 n.1 (Thomas, J., concurring) (emphasis added). "What qualifies as 'ministerial' is an inherently theological question, and thus one that cannot be resolved by civil courts through legal analysis." *Id.* at 763.

This Court's decision in *Billard v. Charlotte Catholic High School* demands that Zinski's Complaint be dismissed. 101 F.4th 316 (4th Cir. 2024). There, despite the religious educational institution explicitly waiving the ministerial exception defense in the district court, this Court

held that it was nevertheless required to consider it because the immunity the First Amendment provides to religious institutions is "grounded in constitutional structure," "implicates important institutional interests of the court," and "involve[s] structural concerns regarding the separation of powers." *Id.* at 325 (cleaned up). As this Court put it, the First Amendment itself—through the church autonomy and ministerial exception doctrines—"does not protect the church alone; *it also confines the state and its civil courts to their proper roles*." *Id.* (emphasis added). Because "[t]he First Amendment's Religion Clauses . . . bar the government from interfering with ministerial employment decisions or involving itself in ecclesiastical matters," *id.* at 326, "*civil courts like ours are bound to stay out of employment disputes*" involving religious institutions like Liberty. *Id.* (emphasis added).

This Court's decision appropriately applies broadly—to all "employment disputes," not just those disputes involving pastors, clergy, teachers, and the like. "The term 'minister' is shorthand for somebody who qualifies for the ministerial exception," but "the title of the exception made it into the case law only 'because the individuals involved in the pioneering cases were described as 'ministers,' and not because the title

54

– with its independent religious significance governs the analysis." *Id.* at 326 n.4 (quoting *Our Lady of Guadalupe*, 591 U.S. at 746). The exception is intended to—and must, by virtue of constitutional command—"shelter certain employment decisions from the scrutiny of civil authorities." *Billard*, 101 F.4th at 329 (quoting *E.E.O.C. v. Roman Catholic Diocese of Raliegh*, 213 F.3d 795, 801 (4th Cir. 2000)).

Judge Richardson's concurring opinion in *Palmer v. Liberty University, Inc.*, is instructive. 72 F.4th 52 (4th Cir. 2023). There, Judge Richardson noted that the ministerial exception unequivocally "*bars employment claims* made by ministers against religious institutions." *Id.* at 76 (Richardson, J., concurring) (emphasis added). Relying on the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979), Judge Richardson demonstrated that the First Amendment prohibits "*the very process of inquiry*" into Liberty's employment decisions, *id.* (emphasis added), because "adjudicating the merits of [plaintiff's] claim would force us to make that inquiry" into a religious institution's decisions about employment. *Id.* "**Before** biting into that apple, we should determine whether the First Amendment protects Liberty" from that very inquiry. Palmer, 72 F.4th at 76.

(emphasis added). "It plainly does. The First Amendment's ministerial exception bars Palmer's suit." *Id.*

Judge Richardson further noted that the ministerial exception "entitles Liberty to *absolute immunity* over its decisions to fire" its employees. *Id.* (emphasis added). The reason is simple: "[s]werving around that issue" in the beginning of litigation "veers [the court] too close to the very interests that the First Amendment protects, and risks entangling us in inherently religious questions." *Id.* It is critical that this Court stay far clear of the inquiry contemplated by Zinski's Complaint because the ministerial exception is but one "specific facet of the church-autonomy doctrine that guards a religious institution's authority to select certain personnel." *Id.* The church-autonomy doctrine "protects religious institutions' power to decide for themselves, free from state interference, matters of church government, *as well as those of faith and doctrine*." *Id.* (quoting *Kedroff*, 344 U.S. at 116 ) (emphasis added).

Once a court decides that the ministerial exception applies, *its inquiry ends*. "The employer need not show that it had a religious reason for firing the minister . . . Instead, the employer may fire the minister for *any* reason—including one that, on its face, has no connection to religion

56

and would otherwise be illegal." *Id.* at 77. "Not only is there no *need* to inquire into [Liberty's] motives . . . that inquiry itself may offend the First Amendment." *Id.* Simply put, the ministerial exception is intended "to protect a religious institution *not only from ultimate liability, but also from judicial inquiry itself.*" *Id.* at 78 (emphasis added). This is because the inquiry itself "encompasses more than just digging through a religious institution's employment files and deposing its leaders . . . the mere act of *questioning* the institution's motives—even if the court ultimately decides that those motives are pure—cheapens its authority over ecclesiastical affairs." *Id.* (cleaned up) (emphasis added).

This is why numerous courts, including this Court, have treated the ministerial exception as a jurisdictional bar—requiring adjudication at the motion to dismiss stage to prevent the intrusive and unconstitutional inquiry into a religious organization's employment decisions. This Court's decision in *Rayburn* held that application of Title VII to disputes between a religious institution and its religious employees is prohibited because religious institutions are immune from such inquiries. 772 F.2d at 1168-72. "*Any attempt* by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise

rights." *Id.* at 1168 (emphasis added). Because intrusion into the employment decisions of religious institutions would violate the First Amendment, this Court held that "the Constitution requires that civil authorities decline to review" such employment decisions, even if the parties seem to invite it to. *Id.* at 1172.

Zinski's Complaint against Liberty simply treads too far into the religious doctrine, beliefs, and decisions concerning who may represent Liberty's religious mission as an employee, and the district court erred in refusing to dismiss it. As Liberty's letter to Zinski references, Liberty's Doctrinal Statement "clearly" provides that: "Human beings were directly created, not evolved, in the very image of God, as either biologically male or female from the womb. . . . Sinful acts are prohibited by God and include denial of sex by self-dentification with a different gender." JA018. Liberty does "not think permitting employees to express their 'chosen' gender identity at work is appropriate *or consistent with the distinctive Christian workplace that is Liberty*," and Liberty only "*employ[s] a workforce that acts in accordance with [its Doctrinal Statement] to protect our religious mission*." JA018  (emphasis added).

58

For an Article III court to inject itself into employment decisions and practices that Liberty unequivocally states are imperative to protect its religious mission is forbidden by the First Amendment. Because maintaining employees that strictly acknowledge and adhere to the Doctrinal Statement of Liberty is necessary to protect Liberty's religious mission, it cannot be gainsaid that adherence to the Doctrinal Statement is "important to the spiritual and pastoral mission of the church," *Catholic Diocese of Raleigh*, 213 F.3d at 801, and Liberty's "explanation of the role of [its] employees in the life of the religion in question is important." *Our Lady of Guadalupe*, 591 U.S. at 757. The First Amendment forbids the inquiry requested in Zinski's Complaint, and this Court must direct the district court to abstain from engaging in it

### C. The district court erred in finding that Liberty was not entitled to determine who qualifies as a minister under its own employment requirements.

The fact that Zinski was employed to provide IT services and not formal religious instruction is neither dispositive nor relevant. Just as "[s]imply giving the title of 'minister' is not enough to justify the exception," the use of a formal title "cannot be a necessary requirement." *Our Lady of Guadalupe*, 591 U.S. at 752. This is why even employees in

59

past cases that were not teachers, priests, ministers, or other prototypical clerical employees still qualify for the ministerial exception. *See, e.g.*, *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309 (4th Cir. 2004) (religious institution's decision to fire a "mashgiach" or kitchen supervisor was not subject to judicial scrutiny); *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 802 (4th Cir. 2000) (music director qualified as minister for purposes of the ministerial exception); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 942 (7th Cir. 2022) (guidance counselor at a religious educational institution qualified under the ministerial exception); *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 985 (7th Cir. 2021) (applying ministerial exception to choir director's suit brought on the basis that a religious institution fired him because of his sexual orientation); *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 704 (7th Cir. 2003) (religious institution's press secretary constituted a minister for purposes of the ministerial exception).

All Liberty employees cooperatively work together to fulfill the University's religious mission to "Train champions for Christ." As the Supreme Court recognized in *Our Lady of Guadalupe*, the ministerial

"exception should include *any employee* who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of the faith." 591 U.S. at 754 (quoting *Hosanna Tabor*, 565 U.S. at 199 (Alito, J., concurring). Every position at Liberty, including those in Information Services and IT, such as where Zinski worked, are critical to advancing Liberty's mission and Christian objective. While some religious institutions may not choose such a wide group of employees as ministers, the affirmations and attestations Zinski signed to being work demonstrate his faith walk was integral to Liberty's vision of a Christian educational environment, including Zinski's Help Desk role. As Liberty noted to Zinski: "Active and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression, would be incompatible with our Christian workplace. At Liberty, these are indeed part and parcel of job performance and workplace conduct." JA019.

Liberty's letter to Zinski made clear, all employees are to model Scriptures and its sincere religious convictions in all aspects of work as a method of conveying and teaching that to students, faculty, and staff.

Zinski was "expected to help [Liberty] carry out [its] mission" and was unquestionably required to model Liberty's religious beliefs "by word and deed" to the students at Liberty. *Our Lady of Guadalupe*, 591 U.S. at 757. In his role, Zinski was required to interact with students, faculty, and staff.

**V. The First Amendment protects Liberty's right not to associate with individuals who openly, intentionally, and unrepentantly espouse religious beliefs that are directly contrary to Liberty's religious beliefs, doctrinal positions, and employment requirements.**

    **A. The First Amendment right to association applies in the employment context.**

Though it expressed doubts, the district court held that the First Amendment right to association applies in the employment context. JA103. It does. As the Supreme Court has noted, "the right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, *economic*, *educational*, *religious*, and cultural ends.'" *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)) (emphasis added).

Liberty has a First Amendment right to refrain from associating with individuals who do not share its religious interests, regardless of any economic or employment aspect to the relationship. The freedom of expressive association "presupposes a freedom not to associate" because "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623. "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Similar to Zinski, "Dale, by his own admission, is one of a group of gay Scouts who have "become leaders in their community and are open and honest about their sexual orientation." *Id.* at 653. Dale was unapologetically trying to alter the Boy Scouts message by forcing it to adopt his views as their own. *Id.* ("Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."). Dale's chosen

63

lifestyle and message was "inconsistent with the values it seeks to instill in its youth members," *id.* at 654, and "the presence of Dale as an assistant scoutmaster would just as surely interfere with Boy Scouts' choice not to propound a view contrary to its beliefs." *Id.*

The Court held that such forced inclusion and forced affiliation by application of otherwise neutral statutes violated Boy Scouts' First Amendment associational rights. *Id.* at 656 ("Having determined that the Boy Scouts is an expressive association and that the forced inclusion of Dale would significantly affect its expression, we inquire whether the application of New Jersey's public accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of expressive association. We conclude that it does.").

The Second Circuit's decision in *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) is instructive. There, New York antidiscrimination law prohibited employers from taking any adverse employment action against any employee on the basis of the employee's decision to obtain an abortion. *Id.* at 283. A pro-life pregnancy resource center in New York sued stating such an employment requirement would infringe the pro-life organization's associational rights by forcing it "to associate with

64

employees or prospective employees whose action indicate that they do not share their views." *Id.* at 287. Much like application of Title VII would here, the Second Circuit held that the New York "statute forces Evergreen to employ individuals who act or have acted against the very mission of its organization." *Id.* at 288. "[T]he government's general interest in bolstering the legal right to engage in that conduct gives way to the freedom of those in the association to join together to express a different view." *Id.* at 291. Simply put, "*Evergreen has a right to limit its employees to people who share its views and will effectively communicate its message.*" *Id.* (emphasis added). *See also Darren Patterson Christian Academy v. Roy*, 699 F. Supp. 3d 1163, 1184-85 (D. Colo. 2023) (noting that it would be a "significant burden on the [Academy's] religious expression" and right to expressive association to require the violate its desire "to hire only coreligionists, and to continue internal polices related to gender distinctions rooted in religious belief"); *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, (N.D. Tex. 2021), *aff'd in part Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) ("For the same reasons that Defendants do not have a compelling interest in forcing an organization to retain, as a scoutmaster, a member who is a

65

gay rights activist, Defendants do not have a compelling interest in forcing Religious Business-Type Employers to hire and retain individuals that engage in conduct that is contrary to the employers' expressive interests. The Government can no more force an association that opposes homosexuality or transgender behavior to hire individuals engaged in that conduct than it can force a gay-rights organization to hire an avowed opponent of homosexuality.").

The same is true here. Forcing Liberty to retain an employee who is openly, intentionally, and unrepentantly engaging in conduct contrary to its sincerely held religious convictions and Doctrinal Statement would violate Liberty's right to expressive association. Liberty has the right to restrict the individuals it employs to those individuals who share its religious beliefs, values, convictions, and interpretations of Scripture. Zinski demonstrated that Zinski does not. Forcing Liberty to employ an individual openly disregarding its Doctrinal Statement and religious convictions is akin to forcing a pro-life pregnancy center to employ a vocal pro-abortion advocate devoted to openly contradicting its message. The First Amendment does not tolerate that nonsense.

**B.  The district court erred in finding that it is only a minimal burden on Liberty to employ and associate with an individual openly, intentionally, and unrepentantly engaged in behavior and beliefs that fundamentally undermine Liberty's religious mission.**

The district court found that it was only a minimal burden to force Liberty to continue to employ and thereby associate with an individual espousing beliefs directly contrary to Liberty's religious mission. For the same reasons articulated *supra*, such forced inclusion is a substantial burden in violation of the First Amendment.

## CONCLUSION

Because Title VII, the First Amendment, and RFRA all prohibit intruding into Liberty's religious beliefs and employment requirements, the district court's order must be reversed.

67

/s/ Daniel J. Schmid

Mathew D. Staver, *Counsel of Record*
Anita L. Staver
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). Not counting the items excluded from the length by Fed. R. App. P. 32(f), this document contains 12,999 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman font.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Defendant-Appellant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 1st day of August, 2025, a true and correct copy of the foregoing was filed via the Court's ECF filing system and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Defendant-Appellant*